STATE ex rel. DEAN, Relatrix, *v.* BRANDJORD et al.,
Respondents.

(No. 7,967.)

(Submitted April 22, 1939.  Decided June 8, 1939.)

[92 Pac. (2d) 273.]

*Mr. Philip O'Donnell,* for Relatrix, submitted an original and a reply brief and argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Enor K. Matson,* First Assistant Attorney General, and *Mr. Clarence Hanley,* Special Assistant Attorney General, for Respondents I. M. Brandjord, as State Administrator and the State Board of Public Welfare, submitted a brief; *Mr. Hanley* argued the cause orally.

*Mr. S. C. Ford* and *Mr. Sam D. Goza, Jr.,* of Counsel, for the above-named Respondents, submitted a brief; *Mr Ford* argued the cause orally.

*Mr. William Freebourn,* appearing in behalf of Respondent County Board of Public Welfare of Silver Bow County, argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

In March, 1937, relatrix qualified for old age assistance under the state plan set forth in Chapter 82, Session Laws of 1937, and was granted a monthly award of $28 by the County Board of Silver Bow county for the month of March, and the same was paid for that and subsequent months until the award was reduced to $25.50 for the month of April, 1939, pursuant to a general plan of reduction inaugurated by the State Board of Public Welfare addressed to all counties. This proceeding in mandamus seeks to compel the Silver Bow County Board of Public Welfare to restore to her the total amount of monthly assistance originally granted her in the sum of $28, and to com-

pel the State Board to pay to her the difference between the March and April awards in the sum of $2.50. Numerous other demands for relief are contained in the petition, disposal of which will be dependent upon the outcome of those just set forth.

Relatrix takes the position that an award once having been given her on the basis of need compatible with decency and health, as required by the Act, cannot subsequently be reduced, modified or vacated except as her needs, after proper investigation, show that it should be changed. She contends that any change or modification made upon any other basis, or for any other reason, is contrary to the legislative standard and criterion of need set up by the Act, and constitutes legislation on the part of the administrative boards.

Respondent County Board admits in its answer that the reduction of the award was made in order to comply with the general bulletin sent out by the State Board ordering the reductions, and that it complied because it feared that no payments would be made to the county for old age assistance unless it made the reductions directed. It admits that the amount to be paid relatrix for April as certified by it to the State Board was arbitrarily fixed in conformity with the directions contained in the bulletins from the State Board without regard to her needs or ability to maintain herself in decency and health.

Respondent State Board answered substantially as follows in justification of its action in directing the reductions: That on the 10th of March, 1939, it determined that the moneys available and to be made available for the payment of old age assistance for the quarter beginning April 1, 1939, were insufficient and would be insufficient to make grants to all persons in the state eligible to receive such assistance on the basis of the grants made for the month of March, 1939; that it passed a resolution setting forth the fact that the legislature had only appropriated the sum of $218,000 for old age assistance for the interim period terminating June 30th, whereas the state department had recognized need for and requested $338,000 for that period; that due

to the condition of county poor funds and other county funds, many of the counties were unable to reimburse the state department in full for their current shares of old age assistance; that no substantial amount of funds would be received from counties for past reimbursements due the state department during the months of April, May and June from the funding bonds and special tax levies authorized by Chapter 188, Session Laws of 1939; and that careful calculations based on these facts and circumstances showed the absolute necessity to make a reduction in the amount of old age assistance payments for the months of April, May and June of not less than 33⅓ per cent. of these payments as made for March.

Reductions were directed accordingly by all counties, but subsequently they were ordered changed to 20 per cent., and this percentage to obtain only for the months of April and May. The possibility of obtaining other funds for June made it impossible for the board to determine the percentage of reduction necessary for that month. This resolution was incorporated in the general bulletins ordering the reductions, and containing alternative methods for the guidance of the County Boards in arriving at the necessary reductions.

The issues thus tendered present for determination the ultimate question as to whether the State Board of Public Welfare is authorized and directed to administer old age assistance within the limits of the funds appropriated by the legislature over a given period of time, or whether it is bound by legislative declaration to pay to all qualified recipients fixed amounts so long as the funds may last, based solely on needs previously found regardless of the amount of money expressly appropriated by the legislature to accomplish that end.

Solution of the question involves the consideration of several ancillary propositions, namely: (1.) What funds are available to the State Board for old age assistance other than those expressly appropriated? (2) Does the Public Welfare Act give a recipient a vested and liquidated claim against the general fund of the state? (3) Does the Act clothe the State Board

with discretionary power to administer old age assistance in accordance with need, giving due regard to the period for which the specific appropriation is intended to cover? We shall dispose of the questions in the order given.

It is first urged by relatrix that the State Board knew, or should have known, on or about March 1 that there was not sufficient money available to pay old age assistance for April, May and June on the same basis as that paid for March; that it was, and now is, the legal duty of the board to make written application to the State Board of Examiners setting forth that an unanticipated emergency has arisen; that the funds and appropriations available to the Public Welfare Board for the operation and administration of the Act are insufficient for that purpose, and that therefore the Board of Examiners should make an order authorizing an expenditure to meet the emergency, to the end that old age assistance might continue to be furnished as stipulated in the Act.

Authorization for such action by the Board of Examiners, on proper showing made, must obviously come from Chapter 40, Session Laws of 1937. Respondents challenge the constitutionality of that Act, but we shall not pass on that question, as we do not deem it necessary to a decision in this case. (*Yale Oil Corp.* v. *Plentywood Farmers' Oil Co.*, 98 Mont. 582, 41 Pac. (2d) 10, and cases therein cited.)

The answer to the contention of relatrix is that no unforeseen or unanticipated emergency has arisen to justify any such action by the State Board of Examiners. As a matter of fact, the unanticipated emergency alleged by relatrix to exist consists of a factual situation clearly foreseen and anticipated by the State Board at the time it prepared and submitted its budget to the 1939 legislature and was set forth in its request for appropriations for old age assistance, and for other funds necessary to administer the Act. As evidence that full information of the financial requirements of the State Board was given the legislature, we quote the following statement from its answer with regard to the budget: ''That said budget estimates

were based upon expenditures made for each of said items for the two-year period ending March 1, 1939, and upon the experience of the department, and a careful study of all factors, such as unemployment conditions, crop and industrial conditions, etc., and taking into consideration the increasing demands upon the department in each of said items month by month during said period, and the increasing inability of the several counties of the state to make reimbursements to the State Department, as provided by law; that said estimates were and are in the honest opinion of the department fair and conservative estimates, and are and were honestly believed to be required and necessary for the operation of the department for said periods."

In the light of these factual allegations we must construe the question of unforeseen and unanticipated emergency. It does not seem reasonable to believe that the legislature in enacting Chapter 40, intended that the same facts and estimates presented to a legislature in session and upon which it refused to act to the full extent requested, could possibly form the basis of the unforeseen and unanticipated emergency mentioned in the Chapter as necessary to invoke action on the part of the Board of Examiners. Clearly, under the showing made, no additional funds could be made available by means of Chapter 40 on the ground of unforeseen and unanticipated emergency. We deem further discussion of this phase of the proceeding unnecessary.

Chapter 40 having demonstratively failed as a possible medium for raising additional funds, we now turn to the Public Welfare Act itself to determine whether the legislature authorized or directed that funds other than those specifically appropriated could be withdrawn from the state treasury.

Article V, section 34, of the state Constitution provides: "No █ █ money shall be paid out of the treasury except upon appropriations made by law, and on warrant drawn by the proper officer in pursuance thereof, except interest on the public debt." Thus control of the purse strings of the state treasury were explicitly placed in the hands of the lawmaking branch of the government, to be tightened or loosened at its will.

The phrase contained in the constitutional provision, "appropriations made by law," does not require the introduction of an appropriation bill, the requirement being met by an appropriation sanctioned by law. (*State ex rel. Toomey* v. *State Board of Examiners*, 74 Mont. 1, 238 Pac. 316.) The usual statement of the requirement is, "that no specific language is necessary to make an appropriation, for the test is as to whether or not the people have expressed an intention that the money in question be paid." (*Windes* v. *Frohmiller*, 38 Ariz. 557, 3 Pac. (2d) 275, 276; *O'Neil* v. *Goldenetz*, (Ariz.) 85 Pac. (2d) 705.) Illustrative of this type of compliance with the constitutional requirement of "appropriations by law" in this jurisdiction are the cases of *State ex rel. Rotwitt* v. *Hickman*, 9 Mont. 370, 23 Pac. 740, 8 L. R. A. 403; *State ex rel. Buck* v. *Hickman*, 10 Mont. 497, 26 Pac. 386; *State ex rel. Wade* v. *Kenney*, 10 Mont. 485, 26 Pac. 197. These cases dealt with salaries fixed by law and which were ordered paid, or at least warrants drawn therefor without express appropriations having been made for their payment.

Does the State Welfare Act carry with it similar legislative authorization to pay money out of the state treasury other than that expressly appropriated? If it does, such proportions as the state is called upon to contribute would, under the authority of the cases last cited, become valid claims against the state when liquidated in the manner provided by the Act, and immediately payable.

The Act provides that when an applicant for old age assistance qualifies to receive such aid, "The amount of old age assistance granted any person shall, subject to the regulations and standards of the state department, be determined by the county department with due regard to the resources and necessary expenditures of the individual and the conditions existing in each case and shall be sufficient, when added to all other income and support of the recipient, to provide such person with a reasonable subsistence compatible with decency and health." (Part III, section III, Chapter 82, Laws of 1937.) From this it is

quite definite that the criterion for making an award is need—need equal to a reasonable subsistence compatible with decency and health. Such is the state plan of old age assistance under the Public Welfare Act, and by Part III, section I, subdivision (c), by the legislature made mandatory and required to be in operation uniformly in all the counties of the state.

Having set up the standard of payment to qualified recipients, and having made such plan mandatory in all the counties, it would seem that a duty was thereby imposed by the legislature upon itself to make adequate appropriations to carry out its will and meet the state's necessary share for participation in such plan. But the mere duty on the part of the legislature to make an appropriation does not satisfy the requirement of an "appropriation by law" any more than does the promise of the government to pay money or make an appropriation. (*State ex rel. Journal Pub. Co.* v. *Kenney,* 9 Mont. 389, 24 Pac. (2d) 96; *Crane* v. *Frohmiller,* 45 Ariz. 490, 45 Pac. (2d) 955.)

In the *Journal Publishing Company Case,* just cited, a printing contract was entered into between relator and the state (then Territory). The statute with regard to payment for work done under the contract provided: "That said party contracting to do the territorial printing as aforesaid, shall render once in each month to the territorial auditor an itemized account, under oath, of all the printing and advertising done for the territory or either house of the legislative assembly, or for any officers or department of the territorial government. And the said auditor and the governor shall examine the same, and if they find it to be correct and in accordance with the provisions of this chapter, the auditor shall draw his warrant on the territorial treasurer for the payment of the same." (Sec. 1636, 5th Div., Comp. Stats. of 1887.) It was conceded that the claim of relator was valid, but the auditor refused to draw a warrant in payment of the claim because of the failure of the legislature to make an appropriation for its payment. The court refused to apply the theory of the case of *State ex rel. Rotwitt* v. *Hickman,* supra, which held that a clause of the Constitution which

fixed the salary of the Secretary of State and prescribed the times of payment, was an appropriation made by law. The court differentiated the *Journal Publishing Company Case* from the *Hickman Case* on the ground that "There is no law which appropriates in express language a certain sum [of money] for the payment of the claim of the relator," and concluded "that the respondent cannot draw his warrant upon the treasurer of the state in payment of the claim of the relator, in the absence of an appropriation by law." (9 Mont. 389, 24 Pac. 96, 97.) Other cases applying the same doctrine and holding that the statutes relied upon did not in themselves constitute "appropriations by law," are *In re Pomeroy*, 51 Mont. 119, 151 Pac. 333, and *First National Bank* v. *Sanders County*, 85 Mont. 450, 461, 279 Pac. 247.

Further illustration of the failure to meet the constitutional requirement of "appropriation by law" is vividly demonstrated by the recent decision from Arizona under a constitutional provision similar to our own. The case is that of *Crane* v. *Frohmiller*, supra. It was there contended that a valid appropriation had been made authorizing the payment of certain claims. The Act, Laws of Arizona, 1931, Chapter 61, relied upon as providing such appropriation or authorization read: "In addition to the powers granted to the governor under Section 2620, Revised Code, 1928, the governor when requested by the tax commission and the attorney general, for the purpose of providing funds to defend suits brought against the tax commission contesting tax assessments, may authorize the tax commission to incur debts and liabilities against the state to be paid as other claims against the state from the general fund." This Act was held not to meet the requirements of an "appropriation by law" for the reason "that, in order to constitute a valid appropriation by the legislature, it must, if the appropriation is to be paid from the general fund, fix at least a maximum amount beyond which such appropriation may not go, although, if the payment is to be made only from a special fund which is itself limited in amount, no limit need be stated in the Act authoriz-

ing the expenditures and specifying for what purpose the money is to be expended." (45 Ariz. 490, 45 Pac. (2d) 959.) In discussing the case, the court quoted the following language from *State ex rel. Davis* v. *Eggers,* 29 Nev. 469, 91 Pac. 819, 16 L. R. A. (n. s.) 630, which applies with particular force in the instant proceeding where the additional funds sought to be spent would of necessity have to come from the state's general fund:. "As all appropriations must be within the legislative will, it is essential to have the amount of the appropriation, or the maximum sum from which the expenses could be paid, stated. This legislative power cannot be delegated nor left to the recipient to command from the state treasury sums to any unlimited amount for which he might file claims. True, the exact amount of these expenses cannot be ascertained nor fixed by the Legislature when they have not yet been incurred; but it is usual and necessary to fix a maximum, either in the general appropriation bill or in the Act authorizing them specifying the amount above which they cannot be allowed."

It is our conclusion that the Public Welfare Act is likewise subject to the limitations recognized in the decisions in the above cited cases; that is, none of the laws relied upon in the cases referred to, nor the Public Welfare Act, appropriate in express language any certain or maximum sums for the payment of the claims in excess of the specific appropriation made.

Both of the plans discussed being untenable and inapplicable, what then is the authority and duty of the State Board with respect to the funds appropriated for old age assistance by the 1939 legislature? The answer to this must be found within the text of the Act itself, which must be read and interpreted with the rule in mind that "legislative enactments are to be so construed that the whole will stand, and, if there is any doubt as to the meaning of one phrase, that phrase must be given such a reasonable construction as will enable it to be harmonized with other provisions dealing with the same subject." (*State ex rel. Bevan* v. *Mountjoy,* 82 Mont. 594, 268 Pac. 558, 560; *In re Wil-*

458

*son's Estate,* 102 Mont. 178, 193, 56 Pac. (2d) 733, 105 A. L. R. 367; see, also, secs. 10519, 10520, Rev. Codes.)

It should be understood at the outset that the old age assistance provisions of the Public Welfare Act (Part III) were enacted in an effort to provide for old age assistance to aged persons in need, in conformity with the federal Social Security Act, 42 U. S. C. A., sec. 301 et seq. In fact, Title 42, section 302, U. S. C. A., provides that the approval by the federal Social Security Board of a state's plan is made dependent upon a state's compliance, in drafting an Act, with numerous conditions and requirements specified by the federal Act. Consequently, our Act did so conform and was approved in its revised form.

It is clear from the Act that old age assistance is intended to be granted on the basis of need as defined by section III, Part III. It is equally clear that the respective county boards are the ones which in the first instance determine the actual cash need of each recipient. All decisions made by county boards are made reviewable by the State Board, and any modification, increase, or withdrawal of an award is based primarily on need. Such change must necessarily take into consideration known subsequent increases in income. Periodic reviews of assistance grants is directed for the express purpose of determining when a grant should be modified, temporarily suspended or vacated entirely.

County boards are made "responsible for establishing local policies and such rules and regulations as are necessary to govern the county department and local administration of public welfare activities except that all such policies and rules and regulations must be in conformity with general policies and rules and regulations established by the state board." (Part I, sec. X, subd. (a).)

Regarding the duties of the State Board and administrator, Part I, sec. III, subdivisions (c) and (d) provide: "(c) The State Board is charged with the authority and duty to exercise

general supervision and control over all activities and agencies as provided for in each part of this Act.

"The state board shall be limited in function to that of general policy and rules and regulations and all administrative and executive authority, functions and duties shall be vested in the state administrator, subject to the authority of the state board.

"The state board shall be responsible for the adoption of such general policies, rules and regulations as are necessary for the government of the state department, county departments or any of its agencies. All such policies, rules and regulations shall conform to the federal Social Security Act, the rules and regulations issued by the federal social security board and also shall conform to the state welfare act and all policies, rules and regulations so adopted by the state board shall be binding upon the several county departments and county boards of public welfare.

"(d) The state department of public welfare is hereby authorized and it shall be its duty to administer and supervise all federal funds allocated to the state and all state funds appropriated to the state department of public welfare, for the activities and purposes set forth under each part of this Act. The state department of public welfare is also hereby authorized and it shall be its duty to do all things necessary, in conformity with federal and state laws, for the proper fulfillment of the purposes set forth in this Act."

By Part I, section VII, subdivision (g), the State Board is charged with the authority to "Assist and cooperate with other state and federal departments, bureaus, agencies and institutions, when so requested, by performing services in conformity with the purposes of this Act." And by Part I, section XIV, the legislature declared: "It is the purpose and intent of this Act that the state board shall be authorized and empowered to accept cooperation from the United States of America, its instrumentalities and agencies in all matters deemed necessary by the state board to carry out the purposes of this Act, and the state board shall have full power to do all things necessary in

order to avail itself of such aid, assistance and cooperation under federal legislation heretofore or hereafter enacted by congress or under any proclamation or order of the executive, or of any executive department or agency, of the United States, now or hereafter promulgated or made.''

From these excerpts it is plain that the legislature vested the ▌ State Board and its administrator with broad discretionary powers in administering the Act, and made them responsible for the adoption of general policies and regulations necessary for the government of state and county departments. It is clear, too, that the whole plan of old age assistance was enacted with knowledge and anticipation of the fact that the federal government under the Social Security Acts had pledged itself to participate in the payment to each qualified recipient of an amount equal to one-half of the amount awarded in each case. However, so much of any payment to the individual as exceeds $30, and apparently grants for medical care and funeral expenses are not counted in computing federal grants. (42 U. S. C. A., sec. 303, subd. (a); and Publication No. 16, p. 1, Bureau of Public Assistance, Washington, D. C., Dec. 1, 1937.)

The method of computing and paying the federal share is set forth in subdivision (b) (1), sec. 303, 42 U. S. C. A. It is there provided: ''The Board shall, prior to the beginning of each quarter, estimate the amount to be paid to the State for such quarter under the provisions of clause (1) of subsection (a), such estimate to be based on (A) a report filed by the State containing its estimate of the total sum to be expended in such quarter in accordance with the provisions of such clause, and stating *the amount appropriated or made available by the State and its political subdivisions for such expenditures in such quarter,* and if such amount is less than one-half of the total sum of such estimated expenditures, *the source or sources from which the difference is expected to be derived,* (B) records showing the number of aged individuals in the State, and (C) such other investigation as the Board may find necessary.''

To comply with the italicized portions above quoted, the State ▮ Board is limited in its certification to the federal government to "the amount appropriated or made available by the state, etc. in such quarter."; or, at most, to a certification of expected sources from which income other than that appropriated might be derived. Reference to the state appropriation bill covering anticipated expenditures of the Public Welfare Department, for the period beginning March 2, 1939, and terminating June 30, 1939 (House Bill No. 419, Session Laws of 1939, p. 671), discloses that the legislature appropriated and earmarked $218,000 to cover the period above mentioned. The State Board having been given so much to operate on for that period, and no more, it then became its duty under the Act to adopt a policy which would best subserve the cause of old age assistance within the means furnished for that purpose. Whether it would be wiser for it to pay full quotas and prematurely expend most, if not all, of the entire fund appropriated for the given period, or whether the needy aged now qualified to receive payments, and the ever increasing number of prospective recipients who may qualify later, would be more equitably and effectively assisted by the general reduction inaugurated by the board, is solely a question of administrative discretion vested exclusively in the board and its administrator. If a general policy of reduction is by the board deemed necessary for the government of the state and county departments, it is its function and duty imposed by the legislature to make such reductions. It is not our province to interfere with the discretionary actions of the State Board, where it appears that it is acting within the scope of its authority. (*Freeman* v. *Board of Adjustment*, 97 Mont. 342, 34 Pac. (2d) 534; *State ex rel. School Dist. No. 29* v. *Cooney*, 102 Mont. 521, 59 Pac. (2d) 48; *State ex rel. Bowler* v. *Board of County Commrs.*, 106 Mont. 251, 76 Pac. (2d) 648.)

When the whole subject of relief for the aged indigent is ▮ taken into consideration, when the history of federal and state legislation is given proper effect, when the national plan

and the subsequently enacted state plans of the different states are understood, it would seem that none of the state plans, including our own, were ever devised to stand or operate without the cooperation of the federal government. (Compare *Rutherford* v. *City of Great Falls*, 107 Mont. 512, 86 Pac. (2d) 656.) If this be true, and we think that it is beyond question the outstanding theory of the whole matter, then it is obvious that our law must be construed, not as an independent Act, but in conjunction with the federal Act, that is, the two Acts must be administered together as a unified code of laws enacted by Congress and the state legislature for the complete and comprehensive control of the subject.

The matter in the final analysis brings us to the fundamental proposition that the subject of relief in its various phases, as provided by law, was strictly within the scope of legislative authority. That branch of the government very properly and necessarily assumed the function of providing the amount to be expended for that purpose, and the manner and method of distribution. The judicial department has neither power nor inclination to usurp that authority. If inadequate provision has been made for the meritorious necessities of the unfortunate people of the state, we may sympathize personally, but we are powerless to intervene officially.

The application for the writ is denied.

MR. JUSTICE MORRIS concurs.

MR. CHIEF JUSTICE JOHNSON:

I concur. It seems to me cruel and misleading to hold otherwise. It is apparent that nothing this court can say will add one dollar to the fund available for old age pensions, and that if relatrix receives more than her pro rata share of the available fund, it must necessarily be at the expense of the others entitled.

To hold, as relatrix contends, that each old age pension must be paid in full so long as funds are immediately sufficient, means that where the funds are not sufficient for all, those first entitled, without regard to relative needs and hardships of others,

must receive theirs in full, leaving nothing whatever for the others. This might serve to deprive whole counties, whose administration of the Act may have been slower; it may, perhaps, deprive Mrs. Dean, the relatrix herein, of any payment whatever for June, for we are not informed as to her relative priority.

One of the minority opinions suggests that the matter is not presented in this case, since the sole question here is the full payment of the April pensions, for which funds are sufficient if the remainder of the fiscal period is ignored. However, it would hold that, so far as possible the full payments fixed by the county boards must be paid; that the state board's sole power to change those amounts is by appeal in each of the thousands of individual cases, and that the only element it can consider is the need of the individual, with no reference whatever to the moneys available. It would necessarily follow from that view that if by reason of full payment of April and May pensions, too little remained to pay all June pensions, the first comers must be paid in full and the rest go without.

It is unthinkable that the legislature had any such intention. The obvious purpose was to provide for all the persons affected and not for a favored few. It is much more consistent with the humane and enlightened purpose of the Act, to hold that where the funds for the fiscal period are insufficient the legislative intent in entrusting the supervisory powers to the State Board, was to minimize any hardship by an equitable apportionment of the fund. Since that is so, and since by the Constitution the courts are forbidden to interfere with another branch of government unless the latter is obviously acting in defiance of law, it seems clear that we cannot disregard the legislative intent nor overrule the executive discretion.

As I said at the outset, it would be cruel and misleading to hold otherwise, for nothing the court can say would add one dollar to the fund for these pensions. In the Constitution the people of Montana, wisely or not, entrusted the appropriation power to the legislature, since it is the branch closest to the people. The legislature is forbidden by the Constitution to abdi-

cate its power to any other agency of the government. No such legislative intent is apparent in the Act in question, and if such intent appeared, it would be clearly beyond the powers of the legislature; it cannot, therefore, be read into the Act.

If the legislature, by this Act, meant to engage itself and its successors to supply without limit and regardless of realities and circumstances, all funds necessary to pay in full all pensions fixed by the county commissioners, it must to that extent have meant, in last analysis, to abdicate to the fifty-six boards of county commissioners its powers over appropriations. Clearly, it could have no authority to do this.

*State ex rel. Board of County Commrs.* v. *District Court,* 62 Mont. 275, 204 Pac. 600, dealing with mothers' pensions, is not in point, since the legislature, itself fixed the amounts to be paid for the benefit of each child, and expressly limited the total amount to be expended for the purpose by any county. It attempted to abdicate no power to any other agency of government, and that case raised no such question as is here presented.

The legislature did not attempt, and had not the authority, to bind the state in advance to supply all funds which might become necessary by the actions of the fifty-six boards of county commissioners,—in other words, it had neither the power nor the intent to issue blank checks to the various county boards, which ultimately other legislatures must arrange to pay. One of the dissenting opinions disagrees with this statement on the ground that an appeal to the State Board is available. However, (1) according to the minority all the State Board can do is to review the sole question of need without regard to the public's ability to pay; and (2) the legislature can no more abdicate its power over appropriations to the State Board than it can to the county boards. In either respect it shackles itself and all succeeding legislatures and abdicates its power over appropriations, if the law is as the minority contend; and it has no constitutional power to do so.

Since these things are true, it is clearly not for the benefit of those persons entitled to old age pensions, and perhaps not

for the benefit of relatrix herself, to require the payment of each award for which funds immediately suffice, without regard for the needs of others in the same month or in other months of the fiscal period. It would, therefore, be neither proper nor equitable for the court to interfere with the executive branch of government as relatrix asks.

There has been an intimation that by reason of refunds from certain counties, additional funds may become available during the fiscal period in question. If so, additional checks should be issued to restore, so far as possible, the amounts deducted, since the only limit to the individual awards as determined by county boards unless appealed from, is the ability of the state to pay under the appropriation as necessarily fixed by the legislature under the Constitution.

I concur in the denial of the writ.

MR. JUSTICE ERICKSON:

I dissent. The majority, in considering the matter before the court, has discussed the question under three headings: (1) What funds are available to the State Board for old age assistance other than those expressly appropriated; (2) does the Public Welfare Act give the recipient a vested and liquidated claim against the general funds of the state; and (3) does the Act clothe the State Board with discretionary power to administer old age assistance in accordance with need, giving due regard to the period for which the specific appropriation is intended to cover?

In discussing the points involved, I shall consider first the third point of the majority opinion. As to it (considering this third point), the majority assume that payment of the full amount of the award to old age recipients until the funds available are exhausted would be contrary to the provisions of the Federal Welfare Act, (42 U. S. C. A., sec. 301 et seq.). In the oral argument much was made of that point, but without any specific showing that such would be the case.

I can find nothing to show that such payment would be in conflict with any provision of the federal Act, nor that such payment would endanger the federal appropriation. That this is true is demonstrated by the answer of the respondents, and by their brief in which they admit that they are now receiving federal assistance on a monthly basis rather than on a quarterly basis, and that assistance has been awarded for only two of the months in the quarter, and that federal assistance for the month of June will depend on a showing by the State Board as to the amount of state funds available for that month. This demonstrates that payment in full of the award made is not contrary to the federal Act, nor will it have any effect upon the amount of money that the federal government will allocate for assistance within the state.

I agree with the majority opinion when it states: "It is equally clear that the respective county boards are the ones which in the first instance determine the actual cash need of each recipient. All decisions made by county boards are made reviewable by the State Board, and any modification, increase, or withdrawal of an award is based primarily on need." A casual reading of Part III of the Act, Chapter 82, Session Laws of 1937, will demonstrate conclusively that the award is based entirely on the need of the applicant and in the review and appeal provided for to the State Board where no award is made, where the award is insufficient or where the award is excessive, the question and the only question to be decided is the question of the need of the applicant. The Act makes the award binding on the County Board.

It is admitted by the respondent that the award made by the County Board is binding upon the State Board. That this is true is demonstrated by the fact that in the present instance the State Board did not of itself directly issue an order cutting all old age assistance awards, nor did it merely make a twenty per cent. reduction from the original award by sending a check for $25.50 instead of $28. Instead, by the issuance of the two bulletins attached to the pleadings, they ordered the county boards to make the reduction.

To circumvent this fact that the award of the County Board is binding on the State Board, as I have stated above, the board says to this court that it did not make the cut, but that the respondent board of county commissioners changed the award. The answer of the County Board and the exhibits demonstrate conclusively that the change in the award to the relatrix was made by the State Board when it issued its bulletins that if the cut were not made no old age assistance funds would be available for the counties at all. The respondent State Board acted entirely without its authority as given it by the Act when the two bulletins were issued, and so long as there was money sufficient to pay the award made to the relatrix, the only power of the State Board was to pay the award in full as provided by the Act.

It is true that the State Board is given some power to make policy. However, nowhere in the Act does it appear that this power to determine policies includes the power to order the various boards of county commissioners to reduce the awards because of the failure of the legislature to appropriate sufficient funds to pay the full amount of the awards throughout the entire quarter.

The provisions of the Act as to method of determining the amount of awards, appeal and review of the determination are specific in the extreme. It was for the purpose of protecting the interests of persons qualified under the Act and to assure them the maximum of security that the legislature was so specific in this. The policy-making and supervisory power given the board and the administrator are the usual ones given to any administrative board or officer to carry out the purpose of an Act. This power is limited to the determination of the means for carrying out efficiently the will of the legislature. To broaden this power as has been done by the majority will be to substitute the will of an administrative board and administrator for the expressed will of the legislature. To insure against such unwarranted assumption of power by the board as is counte-

nanced here, the legislature included section 19 of Part I of the Act. That section is ignored entirely by the majority.

"The checks in payment of public assistance shall be issued in the *full approved* amount for each eligible approved grantee, and the original monthly payment shall be from the state public welfare accounts." The legislature could not have made its intention more clear than by this section and by section 3 of Part III of the Act. It specifically excludes from the discretion of the State Board and from its power to determine policies the right to pay a sum less than the award of the County Board.

Within recent months the question of the power of an administrative board under welfare Acts similar to ours has been construed by three courts. The most recent case is *Welch* v. *State Board*, (Ariz.) 87 Pac. (2d) 109, 112. In that case the plaintiff was employed as a social service worker by the County Board under an Act similar to ours. Without notice or hearing as in the Act provided the State Board ordered the County Board to dismiss the plaintiff, basing their order upon the discretionary and supervisory powers given them by the Arizona Act. The grant of supervision over the county boards contained in the Arizona Act is similar to that contained in our Act. In upholding the contention of the plaintiff, the court said: "While it is true that the county boards are under the direct supervision and control of the State Board, nevertheless that control must be exercised by the State Board in accordance with the manner set forth in the Act. It does not appear from the statement of facts that plaintiff's removal was made in this manner, and we think, if this be the case, it was done without authority of law."

The supreme court of the state of Illinois had occasion in a recent case, *People ex rel. Freeman* v. *Department of Public Welfare*, 368 Ill. 505, 14 N. E. (2d) 642, 643, to pass upon the power of the department of public welfare under an Act similar to ours where an attempt was made to justify certain acts of the department under the discretionary and supervisory power granted to the department: "The General Assembly has placed

the administration of the Old Age Assistance Act in the Department of Public Welfare and the county departments. Power to make the law or a discretion as to what the law shall be was not delegated. The authority or discretion granted to the administrative agencies as to the execution of the statute, it follows, must be exercised under and conformably to the law itself. Aid shall be given, the Old Age Assistance Act commands, to any person who meets the requirements set out in the 9 paragraphs of section 2 as amended, Ill. Rev. Stat. 1937, c. 23, sec. 411, pars. (a–i). The determination of whether an applicant meets certain of these requirements is a matter which involves the exercise of judgment and discretion. Other requirements, however, are specific in the extreme, and do not involve administrative judgment and discretion.''

The supreme court of the state of Washington in *Conant* v. *State*, (Wash.) 84 Pac. (2d) 378, 381, was faced with the same type of argument as that used in this case, and that argument is apparently what influenced the majority to hold as it has here. The Washington Act provided that whenever persons over 65 years of age did not have sufficient independent means of their own for their adequate support, and it was so found by the local welfare board, they were entitled to benefits under the old age assistance Act. The facts in the *Conant Case* were that the applicant had relatives who were willing and able to support her. It was argued there, as here, that under their supervisory and policy declaring power the state welfare board could deny to her the benefits of the Act, and it was strenuously urged that a decision allowing her recovery would have a serious effect on the financial situation of the state. In disposing of this argument, the court said: ''The naive argument that the cost to the state in view of the fact that on January 1, 1937, there were approximately 123,000 persons more than sixty-five years old in this state, would have a serious effect on the fiscal problems of the state should be addressed to the legislature and not to the court.''

The majority opinion says that the court should not interfere with the discretion of the administrator and that it was not the

470

province of the court to declare policies. I feel that the majority opinions do just that. If, in ordering the cut, the administrator and board were acting within their policy-making province, the court should not interfere; but here the administrator and board were acting entirely outside the scope of their authority. It may be true that a correct public policy would call for the apportionment of the funds available over the three month period. However, as I have pointed out, the Act nowhere, either in the federal or state Act, gives the board or the administrator the power to do this. The majority opinion, in overlooking some provisions of the Act and in upholding the board in its action, is determining public policy and is acting as a legislative body and not as a judicial body bound by the provisions of the Acts of the legislature.

The relatrix urges that it was the duty of the State Board to apply to the State Board of Examiners as provided in Chapter 40, Session Laws 1937, for authority to issue warrants as in that Act provided when the funds available were exhausted. In the majority opinion in discussing this point by way of *dictum* it is stated that this is not such an unforeseen or unanticipated emergency as contemplated by that chapter. In so holding the majority recites that a budget was presented to the legislature calling for a sum considerably in excess of the amount appropriated, and that the failure of the legislature to appropriate the amount requested conclusively demonstrates that the legislature realized that the sum appropriated would be insufficient to pay the full amount of the old age assistance awards. I am unable to agree with this view. The legislature specifically vests in the State Board of Examiners, by Chapter 40, the discretion to determine whether or not an emergency under the terms of the chapter exists. It is probably true that this situation was foreseen by the administrator and the State Board. However, the legislature contemplated that in order for Chapter 40 to apply the situation must have been unanticipated or unforeseen by the legislature and not by any administrative board.

I am not disposed to interfere in advance with the discretion of the State Board of Examiners, and until that board has ex-

ercised its discretion upon proper application I cannot say that this is or is not an unforeseen or unanticipated situation as contemplated by the Act. That would depend upon the showing made to the Board of Examiners. However, it would seem upon the record here and from the briefs that this is a situation contemplated by Chapter 40 and that the administrator and the State Board should have applied to the State Board of Examiners, when it became apparent that there were not sufficient funds to pay the awards, as in the Act provided, or at least that they should make such application when the funds are exhausted. Favorable action by the Examiners upon such an application would avert the dire consequences predicted in the specially concurring opinion of the Chief Justice.

The majority opinion discusses at some length the second point raised in the opinion, "Does the Public Welfare Act give a recipient a vested and liquidated claim against the general fund of the state?" To my mind that question is not before us under the petition of the relatrix, and it properly cannot be determined here. It is admitted by the State Board that there are funds available to pay the original award for the month of April. The question can only properly be raised when the funds are exhausted so that there is no money available in the fund to pay the award. It may be noted in passing that the award is not a fixed, inflexible amount, but is subject to change in accordance with the terms of the Act. The change made in the amount of the award to the relatrix by the respondent County Board upon the order of the State Board was improper and void. The relatrix was entitled to the amount originally awarded her. A writ should issue commanding the respondent State Board to pay to the relatrix the difference between the original award and the amount paid her for the month of April, the difference being $2.50.

MR. JUSTICE ANGSTMAN:

I concur in the dissenting opinion of Mr. Justice Erickson.

The suggestion in the special concurring opinion that if the writ applied for were to be issued, we would be holding that the

legislature had issued blank checks to the county commissioners of the state and had abdicated for itself and succeeding assemblies the power over appropriations, is unwarranted. These alarming results do not follow. The legislature has provided for a check upon the amount payable to any recipient by providing for an appeal to the State Board by anyone interested, or by review by the State Board of its own motion. If it desired other review it would have so provided. The suggestion that succeeding legislative assemblies would be shackled were the writ to issue rests wholly in imagination.

I think whichever way this case goes, each succeeding legislative assembly may deal with the question of old age pensions as it sees fit.

A careful reading of the statute fails to reveal any authority on the part of the State Board to reduce any of the awards except on review as provided by statute, which was not done here. Were the situation reversed, i. e., had the legislature appropriated more money than was needed to pay the awards of recipients, and had the State Board arbitrarily increased each award so as to use all of the money appropriated, the members of the court who go to make up the majority in this case would certainly have to hold that the State Board has not that authority. I find no authority on the part of the State Board to either reduce or increase the awards except upon a review provided for by statute, which concededly was not followed here. The board is a creature of statute and possesses only such authority as the statute gives it. If the State Board has the authority exercised here, then could it not, for the same reason, instead of making a flat horizontal reduction in each award, eliminate entirely any award to those between 65 and 68 years of age, or drop from the relief rolls certain recipients on some other basis selected by the State Board?

The answer to all of these suggested courses of procedure is that before the State Board can do any of these things it must point to some statute authorizing it to do so. That it has not done, for the obvious reason that no such statute exists.

To compel the payment of the awards made, so long as there remains sufficient money to do so, as is sought here, does not in anywise change or alter the appropriation made by the legislature. If the appropriation is or must be altered that will have to be done, not by any action of the county commissioners, but under the sanction of the legislature as prescribed by Chapter 40, Laws of 1937, or by the legislative assembly in general or special session.

I think the writ applied for should issue.

Rehearing denied July 12, 1939.