PAMPEL, Superintendent of the Montana State Hospital,. Plaintiff, *v.* STATE BOARD OF EXAMINERS et al., Defendants.

(No. 8431.)

(Submitted April 27, 1943.   Decided April 30, 1943.)

[136 Pac. (2d) 991.]

*Mr. Albert H. Angstman,* for Plaintiff, submitted an original and a reply brief, and argued the cause orally.

*Mr. R. V. Bottomly,* Attorney General, and *Mr. George S. Smith,* Assistant Attorney General, for Defendants, submitted a brief, and argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

Plaintiff Pampel, superintendent of the Montana State Hospital, seeks a declaratory judgment against the members of the State Board of Examiners and against the State Auditor finding the Board justified and warranted in declaring the existence of "an unforeseen and unanticipated emergency"

with respect to the financial needs of the Montana State Hospital and in authorizing expenditures in excess of present legislative appropriations therefor within the meaning of Chapter 40 of the Laws of 1937, and determining "the full rights, powers and duties" of the state board under said chapter, and the duty of the State Auditor with respect to the issuance of warrants if an emergency be so declared. For obvious reasons this court has accepted original jurisdiction. The defendants have appeared by answer, but there are no issues of fact.

The facts are that during the recent regular legislative session of the Twenty-eighth Assembly, plaintiff having found that the appropriation made by the Twenty-Seventh Legislative Assembly for the said purposes for the present fiscal year ending June 30, 1943, was almost exhausted, and that $101,000 of additional funds would be reasonably necessary for the balance of that period to provide for the care, food and maintenance of the inmates of Montana State Hospital with extreme economy and curtailment of operating expenses, requested a deficiency appropriation in that amount; that a special joint committee of the Senate and House of Representatives, after an inspection of the Montana State Hospital, made a detailed report which demonstrated clearly the need that the appropriations for the institution be increased; that the appropriation committee of the House approved an additional appropriation of $88,000 for the purpose, which was thereafter reduced to $35,000 in the appropriation bill as finally passed and approved; that the said sum has been practically exhausted, and that an emergency exists at the said institution and a like emergency at the Montana State Training School at Boulder; that plaintiff has requested the State Board of Examiners to authorize expenditure of the necessary additional funds in excess of the legislative appropriations under authority of Chapter 40, Session Laws of 1937, but that the State Board has, by resolution, declared its lack of authority, but "would declare an emergency in this matter, were it not for the decision of the Supreme Court in the case of *State ex rel. Dean v. Brandjord,*

108 Mont. 447 [92 Pac. 2d 273]," in which it was held on the facts considered in said case that when the Legislature had refused to act to the full extent requested in making an appropriation of money for the support of a State Department, such situation could not form the basis of the unforeseen and unanticipated emergency mentioned in Chapter 40, Laws of 1937; that unless additional funds are provided, it will be necessary to discharge the inmates and close the institution.

The defendants contend that section 2 of Chapter 40, upon which plaintiff relies for the remedy sought, is inapplicable to the present situation; that it would furnish no adequate relief; and that it is unconstitutional. They contend (1) that it is inapplicable because the emergency was not "unforeseen and unanticipated," having been foreseen and anticipated by the plaintiff and the State Board of Examiners and fully disclosed to the legislature which, in spite of that fact, refused to make a sufficient appropriation; (2) that it would not furnish adequate relief because it would merely authorize plaintiff and the State Board of Examiners to seek the furnishing of supplies and service on unsecured credit, to be paid for only if a subsequent legislative assembly should see fit to make the necessary deficiency appropriation therefor. They contend further (3) that the Act in question is unconstitutional if, as plaintiff contends, it seeks to empower the Board of Examiners, an agency of the executive branch of government, to authorize expenditures in violation of section 34 of Article V and of section 10 of Article XII of the State Constitution, which provide that no money shall be paid out of the treasury except by appropriation made by law, and on state warrant, and further in violation of section 12 of Article XII which provides that "no appropriation shall be made nor any expenditures authorized by the legislative assembly whereby the expenditures of the state during any fiscal year shall exceed the total tax then provided for by law, and applicable to such appropriation or expenditure, unless the legislative assembly making such appropriation shall provide for levying a sufficient tax, not exceeding the rate allowed

in section nine (9) of this Article, to pay such appropriations or expenditures within such fiscal year * * *."

Section 2 of Chapter 40 is as follows: "If it shall at any time appear to the state board of examiners that due to an unanticipated increase in the number of inmates or patients of any penal, custodial or charitable institution, or that due to any unforeseen and unanticipated emergency in the case of such institutions, * * * the amount appropriated for the maintence and operation of any state institution, * * * with all other income of the institution, if any, will be insufficient for such purposes during the year for which the appropriation was made, on written application to such state board of examiners, setting forth in detail the reasons therefor, said board of examiners, by an order made and entered at length, with such application, in its minutes, may authorize an expenditure to be made during such year for such purposes in such an amount in excess of such income for said year as said board of examiners may deem necessary and required, and the board, managerial staff or other authority in charge of any state institution, * * * may expend such amount, and no more, for such purposes during such year; provided that any increase in expenditure so authorized for any penal, custodial or charitable institution due to increase in number of inmates or patients, shall not exceed the cost per inmate day as set forth in the last preceding legislative budget for each such institution. Said state board of examiners shall report to the next legislative assembly the amount expended or indebtedness or liability incurred under such authority granted by it and request that a deficiency appropriation bill be passed to take care of and pay the same."

Since the final sentence of the section clearly indicates that no payment of any expenditure so authorized by the Board of Examiners is to be made unless pursuant to subsequent deficiency appropriation therefor, it would seem that by its enactment the legislature was not attempting to delegate its authority over appropriations to the Board of Examiners, and that by acting under it the Board would not be exercising any author-

ity over appropriations. However the body of the section seeks to delegate to the Board the power to "authorize an expenditure" in "any unforeseen and unanticipated emergency," which even the legislature is, by section 12 of Article XII, supra, precluded from doing in excess of the then authorized tax income of the state, unless at the same time it provides for a sufficient tax.

Counsel speak of section 2 of Chapter 40 as an emergency law, empowering the Board of Examiners in such emergency to authorize expenditures in excess of the legislative appropriations, and that is in effect what the section seeks to do. However it is not an Act for that purpose, but is merely an exception or proviso to Chapter 40 which is a prohibitory Act, the title of which is as follows: "An Act to prohibit any * * * state institution * * * of the State of Montana having charge or regulation or supervision of the disbursement or expenditure of the income provided for any such state institution, * * * maintained in whole or in part by the state, from expending or contracting to expend, or ordering or requiring any inferior authority to expend, any amount in excess of the annual income from legislative appropriation and other authorized sources, *except as in this Act permitted,* and granting the board of examiners authority to decrease expenditures under appropriations within the limitations of this Act, and providing penalties for violation of this Act and for the removal from office or employment of persons violating this Act."

The only reference in the title to the matter in section 2 is the clause "Except as in this Act permitted"; that section only provides an exception to the prohibitions expressed and the penalties imposed by the bulk of the Act against the exceeding of appropriations by the agencies named. The point is not that in such emergencies the appropriation powers have been delegated to executive officers of the state, but that those officers might then authorize the necessary expenditure in excess of the appropriations without incurring the penalties otherwise imposed by Chapter 40. In short, Chapter 40 is not an emergency

expenditures Act. It is an Act forbidding expenditures of funds in excess of appropriations, with an exception for certain emergencies. Thus the emergency provision is the tail and not the dog.

Whether section 2 of Chapter 40 is applicable to the present ██ ██ situation depends entirely upon the question whether the insufficiency of the appropriation for the purpose is due to "any unforeseen and unanticipated emergency" within its meaning.

There is no room for argument about the meaning of the words "unforeseen" and "unanticipated." Since they are obviously not used in any technical sense they must be construed according to the context and the approved usage of the language. (Sec. 15, Rev. Codes.) Everyone knows that "unforeseen" means not foreseen, and that "unanticipated" means not anticipated or expected.

By the very nature of the general rule declared by Chapter 40, and of the exception from the rule provided by section 2 of that chapter, it is apparent that the "unforeseen and unanticipated emergency" must be one which was unforeseen and unanticipated by the legislative power, and for which it was therefore unable to provide by an appropriation. (*State ex rel. Dean* v. *Brandjord,* 108 Mont. 447, 92 Pac. (2d) 273.)

It is immaterial, therefore, that the emergency may have arisen since the original appropriation for the biennium by the 1941 legislative assembly. The material point is that the emergency justifying the extra expenditure must have arisen since the legislature had its last opportunity to provide for it by a specific appropriation, which was manifestly at the legislative session of 1943. Nothing is claimed to be known now which was not known and disclosed to the legislature then, and it would be a stultification of the words of the statute to hold that because it was not foreseen when the original appropriation was made in 1941 it is immaterial that it was foreseen in 1943, and that with full knowledge of the facts the legislature nevertheless refused to make the appropriation.

It is impossible to hold that the present situation is the result of an emergency unforeseen and unanticipated by the 1943 legislature, for a request was made of it by the proper authorities for the necessary funds to meet this exact situation and the legislature had full opportunity to provide for the need. Furthermore, while the report of the joint investigating committee related mainly to the more permanent situation presented by practically worthless land, obsolete physical plant, insufficient toilet and sanitary facilities for the inmates, and generally inadequate equipment, it pointedly referred also to the immediately serious lack of sufficient doctors, attendants and employees, the insufficient salaries paid most of the staff, and the pitifully inadequate sum of 6.3 cents per meal upon which the inmates were then being maintained to the best of the staff's ability.

Since, therefore, the present situation is not within section 2 of Chapter 40, there is no occasion for considering whether action by the Board of Examiners under that section, if permissible, would have been adequate, or whether the section is constitutional. The plaintiff has not in any event shown facts entitling him to any relief under the Act.

It is suggested that some relief should be devised by this court because none can be had otherwise except through a special session of the legislature, which would cost money, and would be contingent upon the legislative will. However, free peoples have determined representative government preferable to government by arbitrary authority, have considered the cost worth paying, and in final analysis have found representative government much less costly in terms of wealth as well as human rights and happiness; and even if it were otherwise the remedy would not lie in the usurpation by the courts of power entrusted by the people to the legislature.

Judgment is therefore ordered against plaintiff and in favor of the defendants.

ASSOCIATE JUSTICES ERICKSON, ANDERSON and MORRIS concur.

MR. JUSTICE ADAIR, concurring specially:

I agree that, under the circumstances here shown, Chapter 40, Session Laws of Montana, 1937, does not empower the State Board of Examiners to authorize expenditures of funds from the state treasury for the two institutions for the remainder of the current fiscal year, in excess of the legislative appropriations therefor. Here are the reasons for the conclusion:

Prior to the convening of the Twenty-eighth Legislative Assembly of the State of Montana (1943), it became apparent and was foreseen by the managing heads of the state institutions for the insane and for the feeble-minded and subnormal and to the State Board of Examiners that the appropriation made by the legislature for operating such institutions for the fiscal year ending June 30, 1943, was inadequate and that such appropriations had been exhausted, or nearly so. Confronted with this situation, Dr. B. L. Pampel, as superintendent of the Montana State Hospital, and Howard Griffin, as President of the Montana State Training School, submitted to the Twenty-eighth Legislative Assembly of Montana (1943) when it convened, requests for supplemental appropriations in the amount of $101,000 for the Montana State Hospital and in the amount of $35,000 for the Montana State Training School, such requested amounts being based upon estimates submitted to such legislature by the managing heads of said institutions or by the State Board of Examiners showing the financial needs of each of said institutions, and the amount of money reasonably necessary to enable each of such institutions to continue to operate.

The Twenty-eighth Legislative Assembly appointed a joint committee, consisting of three members of the Senate and three members of the House of Representatives, to investigate conditions at the Montana State Hospital. This committee visited the institution and thereafter made a detailed report to the Legislative Assembly setting forth, in writing, the committee's findings and recommendations. Space will not here permit incorporating the joint committee's entire report to the Assembly, but I quote the following excerpts therefrom, viz:

"We, your Special Joint Committee of the House and Senate, appointed to investigate conditions at the Montana State Hospital at Warm Springs, submit herewith our report on such investigation.

"A request has been registered that this report be made in considerable length and detail, and there seem good reasons for acceding to such request, namely (a) *because the members of the legislature and the people of the state generally wish to have the full facts with regard to conditions at Warm Springs,* (b) because time and distance do not permit many people to make general visits to this hospital and see for themselves just how things go, and (c) because such inspection tours are disturbing to the patients and not to their best interests, hence are to be discouraged. Because of these reasons, *we feel the members of the legislature should be given the complete story and thus be in a position to know all details of our findings.*

"*The responsibility for the welfare of these patients and the conditions under which they live, lies after all with the legislature and the people of the state, and* is merely passed down, through the Governor and the State Board of Examiners, to the superintendent of the institution, who in turn is held accountable. The superintendent's task has been made difficult lately because of numerous factors, among which may be noted the following, (a) *lack of sufficient appropriation to meet the many needs of the patients and the institution,* (b) the stoppage, due to the war emergency, of construction of new buildings at the institution, for which bonds were voted by the state in 1940, which still leaves a badly overcrowded condition there." * * *

"Among the dormitories are several wooden buildings, mostly two stories high, which are virtual fire traps for the patients housed within. A good example of the crowded condition of the institution may be observed in these old buildings, Cottage A, for instance, houses 58 women patients, with beds crowded almost as close as they will stand, upstairs and down. And for the 58 patients there is one old fashioned bathtub downstairs.

Cottage B, another wooden building of about the same size, houses 67 women patients, has one bathtub downstairs, and only three toilets for the two floors. Cottage F, where are kept the worst women cases, houses 66 patients, with bath and toilet facilities about the same as for the other cottages mentioned. * * * Such is the condition of the old buildings, which should have been replaced long ago with more modern and fire-proof structures. The equipment is antiquated all through the institution. * * * The kitchen and bakery display the worst shortcomings of all in equipment. Here the work must go on regardless. And the implements are old style and crude beyond belief. * * * *No elaborate meals could be expected at the price of 6.3 cents each,* and it seems remarkable that such wholesome meals as Mrs. Wolfe's menus for December show, could be put out at that price. * * * It is perhaps a fact, as a study of the menus indicates, that the meals are an unending succession of stews, beans, and such boiled foods, with an abundance of fair quality bread, some butter, and now and then perhaps an egg. The reason for the stews has already been indicated, that the kitchen facilities afford little chance to prepare the food in any way. In spite of the antiquated equipment all through the institution—plumbing, heating, laundry, kitchen, old worn floors, and the like—this much can be said, that everything is kept clean. * * * Dr. Holmes, a woman of great character and considerable driving force, is endeavoring to move heaven and earth to put into effect this modern method of patient treatment at Warm Springs, to the end that patients may be restored to a normal state of mental health and released eventually from the institution. * * *

"Given such a farm, such a soil on which to build, such a jumble of ill-assorted structures to be termed an institution, *combine these with an attitude of 'put them out of sight, keep them out of mind, cut appropriations to the bone'—such an attitude as has been displayed for years past by our legislature and our people generally, and you have what we call the Montana State Hospital.* The accepted notion all through the state

of what Warm Springs represents—a correct notion largely—is that of a place to herd together a lot of poor nuts, lock them up and leave them.

"Such is not the ideal an humane, enlightened people should hold regarding their hospital for the mentally afflicted. Rather, it should be thought of as a place where comfort is afforded, where surroundings are conducive to a cheerful frame of mind, where food is well selected and prepared, where interests are provided to capture the attention of these poor befuddled minds, where personal care and attention are given each individual, and where the best medical and psychiatric service is available to all. Until the people of Montana come to think of their hospital in this light, until they get hold of the idea of making their institution a place for the tender treatment and cure of mental ills instead of a wretched prison, Warm Springs will continue in bad grace and repute, regardless of valiant efforts of devoted workers there to lift it out of that miserable hole.

"*If any institution in the state has been forgotten—cast off, forgotten and denied—it is Warm Springs. Warm Springs patients living these days on 6.3 cents a meal!* How can a broken mind regain its health and equilibrium unless the body is well nourished? *Miracles are being wrought now in the kitchen with the money this state niggardly allots, that is true.* Nevertheless, an attendant whose word can be relied upon, who looks after a ward of men at certain hours, whose job it is, among other things, to bathe them, makes the considered statement that *these men have pods, not stomachs, after months of near starvation.*

"Food, good housing, care. These are the things needed to restore sick people to normal health. The housing problem will have to wait, of course, till materials are available again. But the care of patients cannot wait. And the proper care of this class of patients requires skillful, well-trained workers. *A startling situation exists at Warm Springs, in the fact that for the nearly two thousand patients there are only two doctors, besides the superintendent. Two thousand mentally sick pa-*

*tients!* The standard set by the American Psychiatric Association for hospitals of the kind is one doctor to one hundred fifty patients. Warm Springs would need eight or ten psychiatrists to come anywhere near that standard; doctors who would be employed to direct and supervise the treatment of these patients. Under such a set-up, more careful examinations could be given to determine the treatment needed for each patient, and his response to that treatment followed closely. This is the ideal picture, one we must strive to realize if we would do the fair thing by these afflicted people. And, while eight more doctors is a number not to be thought of now, the addition of two or three is imperative, it seems. With salaries provided that will bring trained men or women, and equipment furnished with which they can accomplish some results.

"Summing briefly this report, the following specific things should be kept in mind:

"1. *That appropriations should be increased rather than decreased for the current needs of the institution.* * * *

"4. That the institution is understaffed to the point where proper care and treatment of the patients is impossible.

"5. That better salaries be provided for the doctors and others in key positions, and better wages generally." * * * (Emphasis mine.)

The people of the State of Montana, in their Constitution, provided that institutions "for the benefit of the insane, blind, deaf and mute, * * * and such other institutions as the public good may require, shall be established and supported by the state in such a manner as may be prescribed by law." (Art. X, sec. 1.)

Article V, section 34 of the Constitution reads: "No money shall be paid out of the treasury except upon appropriations made by law, and on warrant drawn by the proper officer in pursuance thereof, except interest on the public debt."

Article XII, section 10 of the Constitution reads: "All taxes levied for state purposes shall be paid into the state treasury,

and no money shall be drawn from the treasury but in pursuance of specific appropriations made by law."

In view of the situation which was confronting the two institutions mentioned and in view of the fact that it was fully foreseen and anticipated by the officers in charge of such institutions that it would be absolutely impossible to continue to operate the institutions and to buy food and pay salaries and provide other necessities for the inmates from the funds made available by the Twenty-seventh Legislative Assembly (1941), it was quite proper to lay the facts in detail before the Twenty-eighth Legislative Assembly and to request it to make the supplemental appropriations required to make available the necessary moneys to operate the institutions for the remainder of the fiscal year ending June 30, 1943.

"The legislative department has the right, and it is its duty, to make appropriations for the payment of salaries and the expense of running the state government." (25 R. C. L., sec. 35, p. 403.)

"The disbursement of state funds is ordinarily regulated by the Constitution or by statute, and may be made only in the manner and upon the conditions thereby prescribed. Before a state treasurer has power or may be required to pay out money from the treasury there must usually be not only a specific appropriation made by law but also a proper warrant or order from the state auditor or other proper officer; and where the Constitution provides that no money shall be paid out of the treasury except on a warrant drawn therefor by a proper officer in pursuance of an appropriation made by law, a statute providing for the disbursement of money without a warrant is void." (59 C. J. 376, pp. 229, 230.)

In *State* v. *Mills*, 55 Wis. 229, 12 N. W. 359, 366, the court held that the trustees of a state hospital for the insane could not bind the state by making contracts for supplies beyond the appropriations made by the state for that purpose, saying: "It cannot be said too emphatically, or repeated too often, that the various boards of trustees and managers of the benevolent and

penal institutions of the state have no power to contract debts beyond the appropriations made by the legislature for the support and operation of their respective institutions. A debt against one of these institutions is a debt against the state and if such boards could contract debts *ad libitum* the constitutional limitation of state indebtedness * * * might become utterly inoperative.''

With the above information before it, the Legislative Assembly was forewarned of the needs of the institutions whose appropriations are here involved and of the estimated amounts that would be reasonably required to meet the absolute and essential needs of these institutions until the close of the current fiscal year. Notwithstanding that $101,000 was requested as the estimated amount needed to meet the requirements of the institution for the insane, and that the further sum of $35,000 was the estimated amount to meet the essential needs of the institution for the feeble-minded and subnormal, the legislature appropriated only the sum of $35,000 for the Montana State Hospital at Warm Springs, and the sum of $10,000 for the Montana State Training School at Boulder as supplemental appropriations to carry them through until June 30, 1943.

The amounts of the supplemental appropriations are wholly insufficient and it is absolutely impossible to continue to operate these institutions, to pay for food, to pay salaries, and to provide for the other necessities for the inmates from now to the end of the current fiscal year unless additional funds are made available for such purposes.

To relieve the distress of these unfortunate charges of the State of Montana, Dr. Pampel as superintendent of the Montana State Hospital, and Howard Griffin as President of the Montana State Training School appealed to the State Board of Examiners of the State of Montana to declare an emergency pursuant to Chapter 40 of the Session Laws of 1937 on the grounds that the present financial embarrassment of these institutions is ''due to an unanticipated increase in the number of inmates'' or that it is ''due to an unforseen and unanticipated

emergency" which are the only two classes of emergencies that are recognized by the Act.

There is no evidence whatever of any "unanticipated increase in the number of inmates" at either institution, and likewise there is no evidence of "any unforeseen and unanticipated emergency" for the simple reason that it was apparent to all concerned at the time the Twenty-eighth Legislative Assembly (1943) was in session, as was found by the joint committee appointed by that assembly that the supplemental appropriations requested were imperatively and immediately required to meet the needs of these institutions. Long ago, the Good Book spoke of the foolish people, without understanding, "which have eyes and see not; which have ears and hear not" but the closing of the eyes and the stopping of the ears to the appeals of our unfortunate mentally afflicted cannot, and it does not, create either an unforeseen or an unanticipated emergency within the contemplation of Chapter 40 of the 1937 Session Laws. (*State ex rel. Dean* v. *Brandjord,* 108 Mont. 447, 92 Pac. (2d) 273). The whole picture was laid before the legislature with all its shocking and revolting details. It was and is its problem. For these reasons the State Board of Examiners is wholly without power, under the law, to make available the funds to meet the urgent needs of these institutions. Only the legislative department of the government is authorized under our Constitution and laws to make the appropriations required.

Rehearing denied May 6, 1943.