STATE OF MONTANA, on Rel. of the Executive Committee of the Joint Negotiating Committee of the INTERNATIONAL UNION OF MINE, MILL & SMELTER WORKERS, an unincorporated association, Ernest Salvas, Chairman, Maurice Powers, Secretary, and Barney Rask, Ray Graham, Mike Tursich and Tom Dickson, members there-

284

OF; AND WILLIAM GATLEY, AS AN INDIVIDUAL, RELATORS AND RESPONDENTS, v. MONTANA STATE DEPARTMENT OF PUBLIC WELFARE, DR. M. F. KELLER, M. W. EDWARDS, MRS. RAY NELSON, MRS. DAN WILLIAMS AND H. A. TIBBALS, AS MEMBERS THEREOF AND W. J. FOUSE, AS STATE ADMINISTRATOR OF PUBLIC WELFARE, RESPONDENTS AND APPELLANTS.

No. 10106.

Decided December 18, 1959.

347 Pac. (2d) 727.

See **C. J. S.** Paupers, § 71.

Thomas H. Mahan, Sp. Asst. Atty. Gen., for appellants.

Thomas H. Mahan, Sp. Asst. Atty. Gen., argued orally for appellants.

Thomas C. Malee, William A. Brolin, Anaconda, for respondents.

Thomas C. Malee, Anaconda, argued orally for respondents.

MR. JUSTICE ADAIR:

In 1937, the Twenty-fifth Legislative Assembly of Montana enacted this state's Public Welfare Act, effective from and after July 1, 1937, being Chapter 82 of the Session Laws of 1937, now sections 71-201 to 71-904, inclusive, Revised Codes of Montana of 1947.

Section III, of Part II of Chapter 82, Laws of 1937, now section 71-305, R.C.M. 1947, reads:

"Section III. *Equal consideration.*

"Persons eligible for and in need of relief shall be, whether employable or unemployable, given equal consideration for public assistance as those persons eligible for assistance under other parts of this act."

Section 71-303, R.C.M. 1947, reads:

"71-303. *Eligibility for relief—investigation of resources.* An applicant for assistance including medical care and hospitalization shall be eligible to receive assistance only after investigation by the county department reveals that the income and resources are insufficient to provide the necessities of life, and assistance shall be provided to meet a minimum subsistence compatible with decency and health."

Section 71-312, R.C.M. 1947, reads:

"71-312. *Application for relief.* Each applicant for general relief shall make application to the county department of public

welfare and the application shall be made in the manner and on the form prescribed by the state department, provided, however, that no application form shall contain what is commonly known as 'the pauper's oath.' All persons wishing to apply for general relief shall have the opportunity to do so.'''

On August 19, 1959, a strike was called in the mines in Butte, Montana, and at the smelters in Anaconda and 'Great Falls, Montana, by the International Union of Mine, Mill and Smelter-workers, an unincorporated association.

This strike closed down the copper industry in the State of Montana. Employment ceased. There were and, at the time this is being written, are no more pay checks with the result that certain employable members of the union, finding themselves without sufficient funds to provide or procure the necessities of life, made application to the county department of public welfare of their respective counties and to the state department of public welfare for such assistance as should be provided to meet a minimum subsistence compatible with decency and health.

*Notice and Letter of August 27, 1959.* Thereafter, on August 27, 1959, and while the strike was in effect, the Montana State Department of Public Welfare, and W. J. Fouse, then and now the State Administrator of Public Welfare, issued and caused to be delivered to each and all of the county departments and boards of public welfare and to all the county and field supervisors throughout the State of Montana, the following letter and notice, viz.:

"State of Montana
"Department of Public Welfare
"Helena, Montana
"August 27, 1959

"From: State Administrator
"To:  All County Boards
       All County Supervisors
       All Field Supervisors
"Re:  General Assistance

"At its meeting on Tuesday, August 25, the State Welfare Board adopted the following motion:

" 'For counties anticipating grants-in-aid from the state department, the maximum amounts that may be allowed as general assistance to meet the needs of people who apply for general assistance as a result of the strike that now exists in the copper industry, shall be as follows:

" '1.  No assistance will be allowed to single men at this time.

" '2.  There will be no allowances for shelter, or utilities for any applicants at this time.

" '3.  Allowances for man and wife together, or other adult couples, shall not exceed $53 a month for food.

" '4.  Allowances for families with children will not exceed the following scale:

| Family of | 2 | 3-4-5 | 6 or more |
|---|---|---|---|
| Adult | 26.50 | 23.25 | 20.00 |
| High School age | 31.75 | 28.00 | 24.00 |
| Grade School age | 21.25 | 18.50 | 16.00 |
| Preschool age | 13.25 | 11.50 | 10.00 |

" '5.  Clothing allowances will be made in emergency situations for children only, on the following scale:

(a) Pre-School child ................................................$ 4.50

(b) Grade School child ................................................ 8.00

(c) High School child ................................................ 12.00'

"The above motion indicates the assistance available to people who apply because of the strike. The above amounts are not intended to apply to your continuing general assistance recipients. It is expected that need for these people will be met on the basis of the standards of assistance outlined in the Manual of Policies and Procedures.

"However, because of the limited amount of money available for grants-in-aid to counties and because those idle by the strike will be in need on a temporary basis, it is felt that amounts allowed these individuals must be reduced from meeting total need.

"It is expected that the State Board will reconsider allowances as the situation demands.

"W. J. Fouse."

A copy of the foregoing letter and notice is made a part of and attached to the hereinafter mentioned affidavit of Ernest Salvas as Exhibit A thereof.

The applicants for assistance, under the provisions of the Public Welfare Act questioned and challenged the right and authority of the Montana State Department of Public Welfare, its members and its Administrator W. J. Fouse to make, issue and promulgate the rulings, orders, limitations and exceptions set forth in the foregoing letter and notice, which were intended to be and which were made applicable only to those persons who have applied or who will apply for *"assistance as a result of the strike that now exists in the copper industry"* in the State of Montana.

Applicants and potential applicants for assistance under the Public Welfare Act and eligible to receive such assistance were informed that the orders, regulations, notices, rulings, limitations and actions of the Montana State Department of Public Welfare, its members and W. J. Fouse as State Administrator of Public Welfare, so made and ordered on August 27, 1959, placed all those persons then on strike and their dependents and families in a separate and different category than that of other persons applying for and receiving public welfare assistance, but who were not involved in the copper strike, and this information, the applicants so adversely affected by the order of August 27, 1959, conveyed to the Executive Committee of the Joint Negotiating Committee of the International Union of Mine, Mill and Smelterworkers, and to Ernest Salvas, as Chairman of such executive committee.

This executive committee requested a hearing before the State Department of Public Welfare and the members of its Board, relative to the order, letter and notice of August 27; 1959, for the purpose of discussing and considering the legality thereof

as well as the effect thereof upon the rights of the applicants for assistance who were so adversely affected by such order, letter and notice.

On September 22, 1959, the State Public Welfare Board held the hearing so requested by the Executive Committee of the Joint Negotiating Committee for the International Union of Mine, Mill and Smelterworkers, at which hearing such executive committee acted in a representative capacity for all those applicants for assistance who were affected by the ruling, order, letter and notice of August 27, 1959.

Section 71-306, R.C.M. 1947, reads:

"71-306. *Right of appeal and hearing.* If an application for assistance under this chapter is not acted upon by the county welfare board promptly or if a decision is made with which the applicant or recipient is not satisfied, he may appeal to the state department for a fair hearing. The state department shall, upon receipt of such an appeal, give the applicant or recipient prompt notice and opportunity for a fair hearing. *Individuals or committees* with complaints or grievances shall have the opportunity to present their complaints or grievances to either the county board or the state department and it shall be required that due consideration shall be given all proven facts presented by such individuals or committees and the county board or the state department shall be required to relieve such situations, if not otherwise prohibited by law and to the extent of funds available." Emphasis supplied.

*Notice and Letter of September 23, 1959.* On September 23, 1959, being the day following the aforesaid hearing so held pursuant to the provisions of section 71-306, supra, the Montana State Department of Public Welfare, its members and W. J. Fouse, as State Administrator of Public Welfare, issued and caused to be delivered to all county public welfare boards and county and field supervisors a second ruling, order, letter and notice, which read as follows:

"State of Montana
"Department of Public Welfare
"Helena, Montana
"September 23, 1959
"From: State Administrator
"To:     All County Boards
        All County Supervisors
        All Field supervisors
"Re:     General Assistance
"At a meeting on Tuesday, September 22, 1959, the State
Welfare Board adopted the following motion:

" 'Having considered the statements presented by represen-
tatives of the union now on strike in Montana and of com-
missioners of affected counties, and considering the present
situation as a temporary, localized welfare problem, and be-
cause of the severe limitation of funds available to the State
Welfare Department, and in order to protect welfare recipients
throughout the state who would otherwise be in jeopardy of
becoming completely without funds, and to protect the women
and children of affected families by providing some funds as
long as possible, the standards set by the August Welfare Board
meeting will be modified as follows:

" 'In counties anticipating grants-in-aid from the State De-
partment of Public Welfare, the following allowances shall be
made:

" 'A.  All families qualifying for general relief as a result of
        the strike. in the copper industry shall receive public
        assistance at a rate not to exceed fifty percent (50%)
        of the standard budget as established by the State
        Department of Public Welfare.

" 'B.  All income shall be considered as resource as follows:
        " '1.  Income of head of family or wife—100%
        " '2.  Adult child in household—50%
        " '3.  Minor child in household—50% of all income
                over $30.00.

" 'C. Each family shall be allowed to retain cash or negotiable instruments to a maximum of $300.00 for their emergency needs.

" 'D. There will be no assistance allowed to single men at this time, as food is being furnished to single men by the union.'

"The State Board will reconsider this policy as the situation demands and as funds are available.

"/s/ W. J. Fouse."

A copy of the above-quoted letter and notice is marked Exhibit B and attached to and made a part of the hereinafter-mentioned affidavit of Ernest Salvas.

Thereafter on October 2, 1959, the State of Montana, on the relation of the relators, the Executive Committee of the Joint Negotiating Committee of the International Union of Mine, Mill and Smelterworkers, an unincorporated association, Ernest Salvas, Chairman, Maurice Powers as Secretary thereof and Barney Rask, Ray Graham, Mike Tursich and Tom Dickson, as members thereof instituted this proceeding by filing the affidavit and application of the relator, Ernest Salvas, in the district court for Silver Bow County, seeking to obtain the issuance of an alternative writ of mandate against the respondents, the Montana State Department of Public Welfare, Dr. M. F. Keller, M. W. Edwards, Mrs. Ray Nelson, Mrs. Dan Williams and H. A. Tibbals, as members thereof and W. J. Fouse, as State Administrator of Public Welfare, to compel and require the respondent department and board, the members thereof and the respondent State Administrator to order, authorize and allow applicants and/or recipients for or of general relief assistance who reside in counties anticipating grants-in-aid and those individuals or families who are affected by the present conditions in the copper industry to receive general relief assistance according to the rules, regulations and schedule of benefits granted other general relief applicants within the State of Montana and affording them equal rights under said rules and regulations

and general relief assistance which is compatible with standards of decency and health and in the manner and form prescribed by the laws of the State of Montana, or to show cause why they should not do so, and upon final determination of this cause, for the relators to have judgment for costs of this action, and a reasonable attorney fee, together with such other and further relief as to the court may seem meet and equitable in the premises.

On October 2, 1959, upon the filing and presentation to him of the aforesaid affidavit, application and petition of Ernest Salvas for the granting of a writ of mandate, the Honorable T. E. Downey, district judge presiding, made his certain order granting relators' application, pursuant to which order an alternative writ of mandate directed to and against respondents then and there issued.

On October 13, 1959, Judge Downey granted leave to the relators to amend their original affidavit and application for the issuance of the alternative writ of mandate and also granted leave to relators to file supplemental affidavits herein in support of their application for the writ.

*Motion to Quash.* Also on October 13, 1959, the respondent, W. J. Fouse, as State Administrator of Public Welfare, by his counsel, Thomas H. Mahan, Esq., appeared in the proceeding by serving and filing a motion to quash the alternative writ of mandate so issued herein, resting his motion on the one and only contention ''that neither the affidavit nor the alternative writ state facts showing that the relators are entitled to a writ of mandate as prayed, or any relief whatever.''

. *Affidavit and Application of William Gatley.* On October 14, 1959, one William Gatley, an individual and as a party beneficially interested in the action and proceedings so instituted in the district court for Silver Bow County, filed therein his certain affidavit and application for the issuance of an alternative writ of mandate to be directed to and against the same

respondents named in the alternative writ theretofore issued on October 2, 1959.

In his affidavit and application for an alternative writ of mandate, the relator, William Gatley, *inter alia,* swore:

That he made his affidavit on behalf of himself and as an individual entitled to receive general relief assistance from the Montana State Department of Public Welfare; that he also made such affidavit on behalf of all those beneficially interested herein and for the purpose of requesting the district court to order an alternative writ of mandate against the above-named respondents herein; that the affiant Gatley is a member of the International Union of Mine, Mill and Smelterworkers, and a member of Butte Miners Union No. 1 of the City of Butte, County of Silver Bow, State of Montana, and that as a member of such union he is adversely affected by the conditions now prevailing in the copper industry, and due to such conditions he is presently unemployed, and is in need;

That the affiant Gatley is a resident of the City of Butte, County of Silver Bow, State of Montana; that he is a married man and has four children born as the issue of his said marriage, which children are dependent upon him for their support and maintenance;

That the affiant Gatley has applied for general relief assistance at the office of the Public Welfare Department located in the courthouse in the City of Butte, County of Silver Bow, State of Montana, and requested the respondent Board, its agents, officers and servants that he, the affiant Gatley, be granted general relief assistance in accordance with the general relief schedule adopted by the Montana State Board of Public Welfare, but that his request was refused and he was granted general relief assistance in accordance with those rules and regulations contained in Exhibit B of the affidavit of Ernest Salvas, on file and of record herein as per the Montana State Department of Public Welfare's above-quoted letter and notice of September 23, 1959;

That the respondents have and that they will continue to enforce the order set forth in the aforesaid letter and notice of September 23, 1959, unless compelled to do otherwise and that respondents will continue to discriminate against the affiant Gatley and against those similarly situated and of the same class as the affiant Gatley; that respondents will continue to arbitrarily refuse, without cause, to give the affiant Gatley, and other such citizens, residents, applicants and members of the International Union of Mine, Mill and Smelterworkers and of Butte Miners Union No. 1, equal general relief assistance according to the standard schedule of the respondent State Board; that such reduced assistance is not sufficient to meet a minimum subsistence compatible with decency and health, and respondents will continue to arbitrarily consider family income contrary to the law in such case provided and continue to arbitrarily deny assistance in accordance with the law in such case made and provided both in form and amount;

That the question presented in these proceedings is one of particular interest to the affiant Gatley and also of general interest to all the membership of the International Union of Mine, Mill and Smelterworkers, and particularly to the members of the Butte Miners Union No. 1, who are applicants or recipients of general relief assistance; that the number of members of the unions so interested is numerous and affects all in the same manner; that it is impractical to bring all of the members of said union so affected before the court as individual plaintiffs and therefore, in addition to the affidavit by Ernest Salvas on file herein, the affiant Gatley makes his separate affidavit for the purpose of bringing this matter to the court, and for the specific benefit of the individual affiant Gatley and others so adversely affected;

That the arbitrary and capricious refusal of the respondent Board, has, and will continue to cause great and irreparable loss and damage to the affiant Gatley, who is an applicant and/or recipient of general relief assistance and who, were it not

for being affected by the economic conditions now prevailing in the copper industry would be entitled to full general relief assistance as adopted by the respondent Board;

That relators have been compelled to secure the assistance of an attorney in the bringing and prosecution of this action and proceeding and compelled to incur expenses therefor, and that the relators therefore request that the court fix and allow relators a reasonable amount for such attorney fees in bringing this action; and

That there is no plain, speedy and adequate remedy in the ordinary course of the law whereby the respondent Board, its officers, agents and representatives, can be compelled to grant the affiant Gatley, general relief assistance in accordance with the law in such cases made and provided, and similarly those of the same class and so situate as the affiant Gatley.

*Order granting Alternative Writ of Mandate.* On October 14, 1959, Judge Downey made and filed an order wherein it is recited that ''upon reading and filing the affidavit of William Gatley, a party beneficially interested herein that the defendants refused to authorize and allow the said William Gatley general relief assistance or equal general relief assistance with others who receive such in the State of Montana, and it appearing that an Alternative Writ of Mandate should issue herein and that Relators have no plain, speedy or adequate remedy in the ordinary course of law.

''Now, Therefore, It Is Hereby Ordered, and this does Order, that an Alternative Writ of Mandate in due form of law issue, requiring the Defendants to authorize and allow residents of those counties anticipating grants-in-aid from the Montana State Department of Public Welfare, and particularly to William Gatley, equal general relief assistance, within the State of Montana, or that they show cause before this Court in division No. 2, in the Courthouse of the City of Butte, County of Silver Bow, State of Montana, on the 22nd day of October, A. D. 1959, at the

hour of 10:00 o'clock A. M. of said day, why they have not done so.

"The Clerk of this Court is hereby directed to issue said Alternative Writ of Mandate.

"Done and Dated this 14th day of October, A. D. 1959.

"/s/ T. E. Downey, District Judge."

Pursuant to, and in conformity with, the foregoing order an alternative writ of mandate was issued and served upon the respondents.

On October 22, 1959, being the return day fixed in the alternative writ of mandate, so issued, none of the respondents were present in person in the district court, but each respondent was there represented by respondents' counsel, Thomas H. Mahan, Special Assistant Attorney General for the State of Montana, who then and there served and filed two separate motions to quash the alternative writ of mandate so issued, each motion being based solely upon said counsel's one and only contention "that neither the affidavits herein nor the alternative writ state facts showing that the relators are entitled to a writ of mandate as prayed or any relief whatsoever." One motion to quash was made on behalf of the respondent, W. J. Fouse, as State Administrator of Public Welfare, separately and alone. The other motion to quash was made jointly on behalf of the remaining respondents, viz.: The Montana State Department of Public Welfare and Dr. M. F. Keller, M. W. Edwards, Mrs. Ray Nelson, Mrs. Dan Williams and H. A. Tibbals, as members thereof, comprising the State Board of Public Welfare of the State of Montana.

On application therefor, and leave granted by the district court, the application for the writ and for other relief was amended to include William Gatley, an individual and as a relator herein.

On October 22, 1959, at the time set for hearing the respondents' return to the alternative writ of mandate, the cause came regularly on for trial before the Honorable T. E. Downey, dis-

trict judge presiding, without a jury, William C. Brolin, Esq., and Thomas C. Malee, Esq., appearing as counsel for relators and Thomas H. Mahan, Esq., appearing as counsel for the respondents, whereupon the court proceeded as follows:

"The Court: Are the parties ready for trial?

"Mr. Malee: Relators are ready, your Honor.

"Mr. Mahan: Defendants are ready, your Honor. I have served and filed two additional Motions to Quash, since the Court issued another Writ of Mandate, to protect our interest, we filed new Motions to Quash and at this time, I would like to submit ten points on my Motions and then argue each point separately.

"The Court: All right, proceed."

Whereupon counsel Mahan argued for the allowance of the motions to quash and counsel Malee argued for the denial of such motions. At the conclusion of the oral arguments, the following proceedings were had:

"The Court: At this time, the Motion to Quash is denied.

"Mr. Mahan: The defendants will stand on their Motion to Quash and refuse to plead further.

"The Court: Do you wish an exception?

"Mr. Mahan: Exception, your Honor.

"The Court: How much time do you want to prepare your bill of exceptions?

"Mr. Mahan: Eight days, your Honor.

"The Court: Very well, 8 days will be all right.

"Mr. Malee: We will proceed, then."

Thereupon, the relator, William Gatley, the relator, Ernest Salvas, and the witnesses, Jack McAndrews and Raymond E. Graham, were called, sworn, examined and each testified as a witness on behalf of the relators. In addition, three documents were offered by relators and marked, admitted and received in evidence as original exhibits in support of relators' application for relief.

At the conclusion of the testimony of the relators' last wit-

ness, Ernest Salvas, he was excused, whereupon the trial ended as follows:

"Mr. Malee: The Relators rest, your Honor.

"The Court: Let the record show counsel for respondents' refusal to present any evidence. The matter will be taken under advisement.

"Mr. Malee: Mr. Mahan, in this matter, we have asked for attorneys' fees and we will leave that up to the Court, or if you wish, we will put on our proof.

"Mr. Mahan: No, I will leave that up to the Court.

"The Court: Let the record show it is stipulated the matter of granting attorneys' fees is left to the discretion of the Court as to the value. The matter will be taken under advisement."

The respondents filed no answer to relators' applications for a writ of mandate nor to the affidavits filed by the relators in support of such applications. The respondents called no witnesses and they introduced no evidence whatever in the trial court.

On October 29, 1959, the trial court filed and caused to be entered its final judgment herein which, omitting the title of the court and cause, reads:

"Judgment Granting Peremptory Writ of Mandate

"An Alternative Writ of Mandate and Order to Show Cause having issued herein on the 14th day of October, 1959, in the above-entitled matter and the same having come regularly before me for hearing on the 22nd day of October, 1959, at the hour of 10:00 o'clock A. M. in Department No. 2 of the above-entitled court, pursuant to said Order to Show Cause, so issued in connection with said Alternative Writ of Mandate, William A. Brolin and Thomas C. Malee, Esqs., appearing as attorneys for Relators and Thomas Mahan, Esq., appearing as attorney for defendants, at which time a Motion to Quash was argued and by the Court denied, and counsel for the defendants elected to stand on said Motion, and hearing on said Order for Writ came on for hearing, no Answer by the defendants having been filed

and the matter submitted upon the pleadings of the Relators, together with oral evidence taken in their behalf and exhibits introduced upon their behalf and the matter was then submitted to the Court for its decision and determination, and by the Court taken under advisement. The Court being now fully advised as to the law and the facts in the premises, finds and orders that a peremptory writ of mandate should be issued in the premises and that said Relators have no plain, speedy or adequate remedy in the ordinary course of law;

"It Is Hereby Ordered, and this Does Order, that a Peremptory Writ of Mandate in due form of law be issued requiring the defendants to rescind their orders of August 25 and September 22, A. D. 1959, with reference to the relief to be granted to those residents of those counties anticipating grants-in-aid to those individuals or families affected by the strike in the copper industry; and particularly to the families and members of the International Union of Mine, Mill and Smelterworkers, an unincorporated association, and said defendants are hereby Ordered to grant to said members and their families herein mentioned, the same general relief assistance accorded to applicants and recipients for general relief in the same class as the members herein mentioned and to grant them the same equal rights under said rules and regulations and general relief assistance which is compatible with standards of decency and health and in the manner and form prescribed by the laws of the State of Montana, and any member or members of said Union are not to be discriminated against solely upon the fact that they are a member of said Union and at the present time unemployed by reason of a strike by the members of their union in various cities in the State of Montana.

"It Is Further Ordered, Adjudged and Decreed that a Writ of Mandate be issued by the Clerk of this Court and under the seal thereof, commanding the Montana State Department of Public Welfare, Dr. M. F. Keller, M. W. Edwards, Mrs. Ray Nelson, Mrs. Dan Williams and H. A. Tibbals, as members there-

of, and W. J. Fouse, as State Administrator of Public Welfare, comprising the State Board of Public Welfare of the State of Montana, to immediately rescind their previous orders, wherein the individuals and members of that class of individuals involved in this action are to receive less general relief assistance than other general relief recipients in the same class within the State of Montana and to make such arrangements and provisions therefor as required by law.

"It Is Further Ordered that defendants make known to this Court on the 6th day of November, 1959, how they have executed this Writ and have with them, then and there, this Writ.

"It Is Further Ordered and Decreed that the Relators have and recover of and from the State of Montana, their costs and disbursements necessarily incurred in this action, and It Is Further Ordered that the Relators have and recover from the State of Montana, the sum of One Thousand ($1,000.00) Dollars, it appearing that the Relators have suffered damage in that amount to date, by reason of the necessity on their part of employing counsel to represent them herein and it appearing to the Court that the respondents appeared and made defense in this proceeding in good faith.

"Dated this 28th day of October, 1959.

"/s/ T. E. Downey, District Judge.

"Filed: October 29, 1959."

*The Appeal.* On November 4, 1959, the respondents appealed to this court from the foregoing order and judgment so given, made and entered.

*The Evidence.* Ample proof to sustain the above-quoted order and judgment was supplied by the following uncontroverted testimony given, without objection, by the relator, William Gatley, at the October 22, 1959, hearing before District Judge T. E. Downey, as shown by the record now before this court, viz.:

"William Gatley, one of the Relators, being first duly sworn, testified as follows, to-wit:

"Direct Examination by Mr. Thomas Malee:

"Q. State your name, please? A. William Gatley.

"Q. Are you the William Gatley who appears as a relator in the case before the Court? A. I am.

"Q. Mr. Gatley, have you needed and required relief? A. I have.

"Q. That was by reason of necessity? A. Yes.

"Q. Have you made your application for such relief? A. Yes, I have.

"Q. Did you receive relief? A. Yes, I received some help.

"Q. Will you explain to the Court the circumstances under which you received this relief? A. Well, being out of work, I applied for it in August and I received help in September.

"Q. In September? A. Yes.

"Q. Have you subsequently; and after the order that we have alleged here to be illegal, made application for relief? A. Yes.

"Q. Were you advised—what advice was given to you concerning your relief thereafter? A. Well, that I was to get 50 percent.

"Q. You were no longer entitled to the relief you had formerly gotten? A. I got 50 percent yes.

"Q. Had you received relief in that proportion since? A. Yes, I received it on October 5th.

"Q. That was on the basis of 50 percent of what others in like position would have received? A. Yes.

"Q. Now, Mr. Gatley, what was your business or occupation? A. Miner.

"Q. At the present time, are you now employed? A. No.

"Q. Will you state to the Court the reason for your unemployment? A. We are on strike.

"Q. You are on strike? A. Yes.

"Q. Do you belong to any organization or organizations with

relation to labor? A. The International Mine, Mill and Smelter-workers and Local No. 1.

"Q. After you were denied relief, did you, by any means, appear before the State Welfare Board to protest their action? A. No, I protested through our joint negotiating organizations.

"Q. Now, Mr. Gatley, did you authorize the negotiations committee of the International Union of Mine, Mill and Smelterworkers to appear for you? A. Yes, I did.

"Q. Did you request that they do so? A. Yes, I did.

"Q. Were there others that did likewise? A. There's lots of them—over 1200 men in our union hall at one meeting that authorized them.

"Q. The authority for the committees appearance before the State Board was given personally by you and by others? A. Yes.

"Q. They were authorized then, to protest the ruling concerning your treatment before the board? A. Yes.

"Q. Do you know whether they did that? A. They appeared here—this is the first time I had been on, but they've got my authority to go ahead and appear here on the 13th, I guess, the first time.

"Q. Do you know whether or not the committee, in compliance with your request, did make a protest to the state board? A. I don't know if they made one separate on my case or not.

"Q. No, no, on conjunction with all, did they make a protest? A. Oh, they've protested all the cases.

"Q. In your affidavit, you have alleged that occurred on September 22nd, 1959, is that correct? A. Yes.

"Q. You knew they were going to make this protest? A. Yes.

"Q. And at your request? A. Yes.

"Q. And with your consent? A. Yes.

"Q. Since that time, your relief orders have been 50% of what they would otherwise have been? A. Yes.

"Q. And you have been so ordered by the Board that this would continue, is that correct? A. That was my orders.

"Q. That is all.

"Mr. Mahan: No cross-examination.

"Witness, William Gatley, Excused."

As before noted, at the hearing of October 22, 1959, before Judge Downey, the respondents, through their counsel, Thomas H. Mahan, Esq., expressly elected to rest their case and to stand solely upon their motions to quash the alternative writ of mandate theretofore issued without pleading further or introducing any evidence whatsoever.

As was said by this court in State ex rel. Du Fresne v. Leslie, 100 Mont. 449, at page 452, 50 Pac. (2d) 959, at page 961, 101 A.L.R. 1329, a mandamus proceeding: "The motion to quash, being equivalent to a general demurrer, brings the controversy before us on the law."

In Bailey v. Edwards, 47 Mont. 363, at pages 371, 372, 133 Pac. 1095, at page 1097, this court said:

"The chapter of our Code relating to *mandamus* has been part of our written law since the territory was organized (Bannack Statutes, p. 123, et seq.; Codified Stats. 1872, p. 206 et seq.; Rev. Stats. 1879, p. 142 et seq.; Comp. Stats. 1887, p. 206 et seq.; Code Civ. Proc. 1895, sec. 1960 et seq.); and very early in our history it was settled that *mandamus* is not a civil action and that the Statute of Anne is not in force with us (Chumasero v. Potts, 2 Mont. 242, 258, et seq.; Territory ex rel. Tanner v. Potts, 3 Mont. 364, 366). In Chumasero v. Potts, this court, touching the nature of mandamus said: 'To call this an action or suit at law would certainly be a misnomer. * * * The manner in which the term civil action is used in these two sections [sections 522, 529, Civil Practice Act, 1872; Rev. Codes 1907, secs. 7218, 7225] shows conclusively that our legislative assembly did not consider that the proceedings in *mandamus* were a civil action. * * * The civil action * * * has reference exclusively to private * * * wrongs. * * * What is the nature of the proceeding

called *mandamus?* "It is not applicable as a redress for mere private wrongs." * * * It can be resorted to only in those cases where the matter in dispute, in theory concerns the public and in which the public has an interest. * * * The enforcement of the writ may incidentally, and as a result, affect private rights, but this is not the prime object of the issuance of the writ. * * * The attempt to classify the proceedings in *mandamus* is always futile. It is *sui generis.* Undoubtedly it may be called an extraordinary legal remedy, civil in its nature. * * *' But, 'being a remedy to enforce public rights and not for the enforcement of private rights or the prevention or redress of private wrongs, it is not a civil action.' Again, in the recent case of State ex rel. Stuewe v. Hindson, 44 Mont. 429, 442, 120 Pac. 485, we find the following: 'This proceeding is essentially *ex relatione.* While Stuewe is nominally the complaining party, the taxpayers of Lewis and Clark county constitute the real party in interest; and if it can be said that from the allegations contained in the affidavit and the alternative writ the taxpayers of the county are entitled to relief of any character, which can be granted in this proceeding, it is the duty of the courts to extend that relief, whether this relator individually desires it, or the Attorney General opposes it. In our determination, we are not bound by the prayer of the relator, but may search the affidavit, and order such relief as the facts stated may warrant; for the relief is granted, not to Stuewe individually, but to the public, the real party in interest.' Inferences, therefore, founded upon the Statute of Anne or upon the hypothesis that *mandamus* is a civil action, can have no validity to require such a construction of section 7224, Revised Codes, as respondent here seeks to evoke."

In State ex rel. Grant v. Eaton, 114 Mont. 199, at pages 203, 204, 133 Pac. (2d) 588, at page 590, a mandamus proceeding, this court said: "The respondents, represented by the Attorney General, have filed motions to quash upon the ground that the facts stated in the petition and the alternative writ are insuf-

ficient to constitute a cause of action or to show that relator is entitled to a writ of mandate. The facts as stated * * * stand uncontroverted. The controversy is thus brought to this court on the law."

In State ex rel. Opheim v. State Fish and Game Commission, 133 Mont. 362, 323 Pac. (2d) 1116, 1118, a mandamus proceeding, this court said: "The motion to quash here performs the function of a general demurrer and brings the controversy before the court on the law."

*The Question.* The question presented to this court by this ▮ appeal, simply stated, is: Do the relators' applications fully supported by the testimony introduced by them state and show relators to be entitled to the writ issued and the judgment entered herein?

Our answer must be and it is in the affirmative.

This proceeding does not attempt to control the Welfare Department's discretion, except insofar as it asks that the department obey the clear command of the statutes. There are many factors that must be taken into consideration to determine what amount of relief assistance any applicant will receive. This proceeding does not seek to command or control the discretion of the Public Welfare Board over the usual and ordinary factors lawfully influencing the amount of assistance which an applicant may be entitled to receive. Admittedly married couples may receive more than single persons and the age of children in equal sized families may determine that one family be given more assistance than another.

What this proceeding seeks is equal consideration for persons equally situated. The statutes so demand and command that the Welfare Act must be administered on an equal basis to all. This proceeding seeks enforcement of that which the statutes set out as a right of the welfare recipient. It seeks to prevent the State Welfare Board from discriminating against welfare recipients because of the source of their unemployment and cause or reasons for welfare need. Nothing in the law gives the State Wel-

fare Board the right to discriminate against the applicants for relief upon such grounds or for such reasons. The orders of the State Welfare Board of which complaint is here made were and are discriminatory and illegal. Such rulings and orders ignored and denied to these relators the plain legal rights expressly accorded them under the provisions of the Welfare Act.

It is ordered that the judgment and order given and made herein by District Judge T. E. Downey, in and for the District Court for Silver Bow County, on October 22, 1959, be and the same are hereby, affirmed *in toto*.

MR. JUSTICE BOTTOMLY concurs.

MR. JUSTICE ANGSTMAN:

I concur in the result reached in the foregoing opinion, but wish to make it clear that I do not say that all employees on a strike are entitled to relief. Whether any particular applicant is entitled to relief depends upon the showing of need, and the determination must be made initially by the county Welfare Board, subject to the right of appeal to the State Department. Section 71-306.

Here the state department has ruled in favor of relief, and we are not concerned with its determination on that point. The only question before us is may the Board award to recipients in the industry now on a strike, one-half of the amount awarded to other applicants and nothing to single men. Section 71-305 answers that in the negative by saying:

"Persons eligible for and in need of relief shall be, whether employable or unemployable, given equal consideration for public assistance as those persons eligible for assistance under other parts of this act."

If such discrimination is ever justifiable, the power to make the discrimination must be granted by the legislature. Neither this court nor the State Welfare Department have authority to proceed in disregard of section 71-305, nor may we defeat the

purpose of section 71-305 by giving it a strained, unnatural and technical construction.

In the dissenting opinion of Mr. Justice Castles, it is asserted that affirmance of the district court order will be to make "welfare funds strike funds" and thus require "all Montana taxpayers to contribute to strike funds."

That is not so. Were we to reverse the order of the district court, welfare funds would still be strike funds. The order of the Welfare Board makes welfare funds strike funds, and not the order of the trial court or of this court.

The affirmance of the district court order may affect the amount of funds going for relief, but it does not necessarily increase that amount over and above what the Welfare Department allowed. Some strikers may not be able to show a need, and hence will not be entitled to anything.

The dissenting opinion of Mr. Justice Castles states that affirming the district court order results in permitting the union to benefit from the welfare funds without divulging its resources. This likewise is not true.

It is true that it need not divulge its resources to the courts, but that is a matter to be considered by the Welfare Board as bearing upon the need of applicants, keeping in mind, of course, that "men do not live by bread alone."

The dissenting opinion of Mr. Justice Castles, after complaining of the use of welfare funds for strikers, then proceeds to the opposite view, and complains that the majority opinion is too harsh on strikers in that it requires striking families to become paupers in order to secure aid. This is not so. All that is necessary is that they show need.

As to whether mandamus is the proper remedy that question is settled by the case of State ex rel. Dean v. Brandjord, 108 Mont. 447, 92 Pac. (2d) 273. It is asserted in the dissenting opinion of Mr. Justice Castles, that it was incumbent upon relators to show that assistance could not be had from the union before they are entitled to complain. The proper place to show

that, if it be material, is before the Board. Here the Board has found that the strikers are entitled to relief. The correctness of that finding is not before us. The only issue here is, after making the determination that they are entitled to relief, may the Department reduce the amount to 50 percent of that awarded to nonstrikers and may they exclude single men.

Then, it is asserted that it is not shown that the Department has sufficient funds to comply with the requested order. If that circumstance would afford justification for the discrimination here in question, then the burden was upon the Welfare Department to make the showing of a lack of funds. As above noted, it does not follow that it will take more funds to comply with the order of the court than to comply with the order of the Welfare Department.

The suggestion in the dissenting opinion of Mr. Justice Castles, that there is a violation of constitutinoal provisions since the strikers must be held to be on a strike voluntarily, is not well-taken. The Welfare Department itself has ruled that even though the strike is by voluntary action, that fact does not justify a denial of relief. For the same reason it does not justify a refusal to follow section 71-305.

If section 71-305 is bad law, or ought not to apply to strikers, that is a question that should be addressed to the policy making branch of our government, viz., the legislative department, and not the judicial branch of the government.

Both dissenting opinions stress the case of State ex rel. Blenkner v. Stillwater County, 102 Mont. 130, 56 Pac. (2d) 1085, 1086.

I do not regard that case as applicable here. In that case mandamus was sought to compel a transfer of funds from the "general and other funds," to the "warrant and interest" fund.

The court held that the application for the writ was insufficient because no transfer was permissible from "other funds" but only from the "general" fund, and it did not allege that

there were sufficient funds in the general fund alone to make possible the transfer.

Here, the court's order does not direct the payment of any money. Both dissenting opinions also rely on State ex rel. Dean v. Brandjord, 108 Mont. 447, 92 Pac. (2d) 273, as empowering the Welfare Department to prorate or reduce payments in order to stretch out the funds over a longer period.

We have not been given any facts as to whether or to what extent there is a shortage of funds, if any. If there must be a prorating it should be applied to all recipients.

MR. JUSTICE CASTLES, dissenting:

I dissent.

The majority opinion is a remarkable one in that it either ignores or evades the real issues. The result of affirming the district court order will be:

(1) It makes welfare funds strike funds and this requires all Montana taxpayers to contribute to strike funds.

(2) It does not require the Union to divulge its resources.

(3) It either ignores the statutes and Constitution or interprets them in an unconstitutional manner.

(4) It will result in requiring striking families to become paupers to secure aid.

In order that the many issues unanswered by the majority opinion be known, I shall set forth many details not mentioned in the majority opinion.

This is an appeal from a judgment of the district court of the second judicial district, which judgment was entered granting a peremptory writ of mandate, directing the State Welfare Board and the members thereof to set aside a certain relief order hereinafter set forth in more detail. The background of the judgment appealed from is as follows: Following a strike in the copper industry, the Montana State Board of Public Welfare, appellants herein and hereinafter referred to as the Board, issued an order on August 27, 1959, relating to general welfare

assistance, in which counties anticipating grants-in-aid from the state department could allow applicants connected with the strike, in other words striking members of the mine, mill and smelter union, certain welfare payments.

On the 23rd day of September 1959, the Board reviewed the above order after meeting with various county commissioners, and respondent union representatives, and others, and then issued a new order, in effect, rescinding the August 27th order. This order provides in part as follows: ''Having considered the statements presented by representatives of the union now on strike in Montana and of commissioners of affected counties, and considering the present situation as a temporary, localized welfare problem, and because of the severe limitation of funds available to the State Welfare Department, and in order to protect welfare recipients throughout the State who would otherwise be in jeopardy of becoming completely without funds, and to protect the women and children of affected families by providing some funds as long as possible, the standards set by the August Welfare Board meeting will be modified as follows * * *.''

The order then provides that the families of the strikers will, in effect, be put in separate category from other general relief recipients and will be entitled to 50 percent of the standard budget sum for a family; that they will be able to retain assets of $300 for emergency needs, count certain family income and exclude other family income; and that single men will be excluded as food is being furnished them by the union. The order concludes: ''The State Board will reconsider this policy as the situation demands and as funds are available.''

After the issuance of the above order, on October 2, 1959, the executive committee of the joint negotiating committee of the International Union of Mine, Mill and Smelterworkers, an unincorporated association, Ernest Salvas, Chairman, Maurice Powers, secretary, Barney Rask, Ray Graham, Mike Tursich and Tom Dickson, as member thereof, as relators, and one indi-

vidual, filed their affidavit and application for an alternative writ of mandate in the district court.

The district court thereupon on the same day issued an order granting an alternative writ of mandate. Following several extensions and amendments, which are not important to this opinion, the State Welfare Board and its members filed motions to quash the alternative writ. The motions to quash were filed on October 22, 1959, and were argued by the attorney general and counsel for the relators. The court thereupon denied the motion to quash, and the attorney general refused to plead further and elected to stand on the motion to quash. Exceptions were noted to the court ruling.

After the Board stood on the motion to quash, the relators then proceeded with their testimony. At the conclusion thereof, the matter was taken under advisement by the court, and a judgment granting a peremptory writ of mandate was entered by the lower court on October 29, 1959. An appeal was immediately taken to this court, and this court granted a stay of proceedings until further order and set the matter for oral argument on November 16, 1959.

The attorney general's position in this appeal is that the lower court's ruling denying the motion to quash is contrary to law and that the peremptory writ of mandate issued by the lower court is contrary to law and to the facts presented.

The motion to quash and the exceptions thereto raised these points:

"1. Relator Union is not a proper party in interest or real party in interest, and therefore is not entitled to a Writ of Mandate against the State Welfare Department.

"2. Administrative remedies provided by law have not been exhausted—therefore, Court action is premature.

"3. Writ of mandate is not the proper remedy in this action.

"4. The writ and other pleadings fail to state a legal cause of action.

"5. The pleadings are defective in that it is not shown that

the welfare department has the funds available to comply with the requested order.

"6. Relators have not alleged an abuse of discretion by the board.

"7. The relator union has not stated what resources it has available to help the affected union members.

"8. The pleadings do not show that the relators have the authority from the union to bring the action.

"9. Relators are asking for an illegal order in that that order commands the State Welfare Board to grant 'equal treatment and adopt equal rules and regulations for all recipients of general relief assistance.'

"10. Mandamus cannot be used to control discretion."

As to the first and second grounds for the motion to quash, we will assume that the relator union, the members of its executive committee, and William Gatley, as an individual, are proper parties. In this connection the complaint and petition for writ of mandamus alleges that the union and its executive committee represent all members of the union and that all of its members are affected in the same manner. In other words, it is shown by the complaint, and not controverted, that the strike is a voluntary strike by the members of the union to improve their own economic status by collective bargaining. This matter is mentioned in view of subsequent discussion about the right of an indigent poor person to welfare payments in the first instance. It is also noted because of the surprising statement found in the union's brief filed before this court that "* * * this matter is one of very arbitrary and capricious discrimination against people who become indigent by reason of the fact that a strike occurred and *over which they had no control.*" Obviously under the pleadings and testimony introduced and on the affidavits, the members of the union must have had control over their own actions. If this be not true, we would be called upon to "pierce the union veil" to discover whether or not each member voluntarily participated in the strike. Since no individual members,

other than Gatley, are parties to this suit, and no such contention is made, we are not free to indulge in such interesting speculation.

Point number three of the motion to quash, that the writ of mandate is not the proper remedy in this action is well taken. The writ of mandate ordered the Board to resign (rescind) its orders of August 25, 1959 and September 22, 1959. In other words the Board had already acted and now the relators demand that these orders be rescinded. Mandamus is ordinarily a remedy for official inaction by compelling the performance of a legal duty which the Board had failed or refused to perform. Mandamus is not the proper remedy to compel the undoing of acts already done with a correction of errors or wrongs already perpetrated even though the action was taken under color of performance of a public duty or was clearly illegal. See 55 C.J.S. Mandamus, sec. 51, p. 87. This court in State ex rel. Hauswirth v. Beadle, 90 Mont. 24, 300 Pac. 197, 198, stated:

" 'The writ of prohibition is the counterpart of the writ of mandate. It arrests the proceedings of any tribunal, corporation, board, or person, whether exercising functions judicial or ministerial, when such proceedings are without or in excess of the jurisdiction of such tribunal, corporation, board or person.' Section 9861, Rev. Codes 1921 [now R.C.M. 1947, sec. 93-9201]."

In Sawyer Stores, Inc. v. Mitchell, 103 Mont. 148, 179, 62 Pac. (2d) 342, 356, this court held:

"A writ of mandate commands an action to be done, while an injunction restrains the doing of an act."

This precise situation is before the court where the Board has acted and relators are attempting to prohibit the Board from enforcing their order of September 22nd.

Contrary to this contention, the relators cite the case of State ex rel. Dean v. Brandjord, 108 Mont. 447, 92 Pac. (2d) 273, wherein a writ of mandamus was apparently approved by this court. However, the propriety of the writ was not questioned in that action.

The motion to quash pointed out that the relators had not pled what resources it had available to help affected union members, or that the relators had authority from the union to bring the action, and the pleadings do not show that the State Welfare Board has funds available to comply with the requested order. The motion is well-taken on these several grounds.

First, the affidavit of the relator, William Gatley, as an individual, fails to show that he has exhausted his resources or that he cannot receive assistance from his union. Nowhere in any of the pleadings is it alleged that the resources of the union are such that union members cannot receive help from the union. It must be kept in mind, in this case, that the union is representing all of its members, as it claims as their agent, and as their sole bargaining power. If this be true, and we assume that it is, then section 71-303, requires an investigation into resources. The relator union is certainly a resource, since it is alleged to be an association of all of its members, and it must be shown whether or not this agency has resources to help. It is a well-known fact that the accumulation of a reasonably necessary strike fund is one of the proper objects of a labor organization. 47 A.L.R. 282.

This court held in State ex rel. Blenkner v. Stillwater County, 102 Mont. 130, 56 Pac. (2d) 1085, 1086, that:

"The question to be determined here is whether the relator upon his application (which was in the form of an affidavit) is entitled to the relief sought. The motion to quash admitted the truth of the allegations of the application, just as a demurrer to any pleading admits the truth of all facts properly alleged therein. [Citing cases.] Defendants recognize this proposition, but they take the position that the application does not state facts sufficient to warrant the issuance of the writ of mandate, and that it is deficient in several particulars. In support of this assertion they set out in their motion to quash several grounds upon which they claim the application is insufficient to justify granting the relief demanded. As we view the

case, it will not be necessary for us to consider all of the propositions therein set forth. *If any one of the grounds enumerated in the motion to quash is well taken and valid, then, of course, the order of the court sustaining the motion must be sustained.*

"One of the points urged by defendants in support of the motion to quash was that *the application failed to allege or show that there were sufficient funds in the general fund of the county to make the transfer possible.* In this connection relator alleged in his application that there were ample funds in the hands of the county treasurer in the 'general and other funds thereof' from which such a transfer could be made. *This we think was insufficient.*

"The rule is well established that before a person is entitled to a writ of mandamus, he must establish a clear legal right in himself and a violation of a duty by the person or officer sought to be coerced. [Citing cases.] \* \* \* *The party applying for the writ must disclose the facts which establish his clear legal right to the relief sought.* [Citing case.] An application for a writ of mandamus must allege facts which show not only a duty on the part of the defendant, but also an ability on his part to perform that duty. [Citing cases.] *It is quite generally held that where it is sought to compel the payment of money, it must be made to appear that there are funds from which the payment can be made."* Emphasis supplied.

The State Welfare Board's order, of September 22, which is the one challenged here, is predicated on a severe lack of funds available, and states that the situation will be reviewed as funds are available. In the face of this, and being the order challenged, it became necessary to allege the availability of funds to carry out the order.

The majority opinion ignores the precedent set by the State ex rel. Blenkner v. Stillwater County case, supra.

While we have felt it necessary to discuss certain technicalities and grounds with relation to the motion to quash, we do not feel that technicalities are the ruling factor in this decision.

Hereafter we shall assume that the motion to quash was not well-taken and go directly to the merits of the case, since this is a matter of great public concern and interest, and the future direction of welfare activities may depend upon the outcome of this case.

The basis for tax collections and payments of tax monies for welfare payments is found in Article X, sec. 5 of the Constitution, which provides:

"The several counties of the state shall provide as may be prescribed by law for those inhabitants, who, by reason of age, infirmity or misfortune, may have claims upon the sympathy and aid of society."

Repeating, "those inhabitants, who, by reason of age, infirmity or *misfortune*, may have claims upon the *sympathy and aid of society*." Emphasis supplied.

The present Welfare Act has its basis in Chapter 82, Laws of 1937. That Act provided in Part II, in section II(b), that:

"The fact of need shall be the determining factor in the right of residents to obtain relief. Any individual or family who is a resident and whose income is insufficient to provide the primary necessities of life, such as food, shelter and clothing, shall be eligible for relief."

Section III of Part II, now R.C.M. 1947, sec. 71-305, provides for equal consideration:

"Persons eligible for and in need of relief shall be, whether *employable or unemployable,* given equal consideration for public assistance as those persons eligible for assistance under other parts of this act." Emphasis supplied.

It will be seen that the words "employable or unemployable" are not as to employment or unemployment but rather as to whether one is out of work because of economic circumstances, or in other words, as the Constitution provides a misfortune upon which a claim for sympathy and aid of society could be made; or whether, one is physically or mentally incapacitated to work and therefore unemployable. It should be remembered that

this Welfare Act was passed in 1937, at the height of a depression, and economic circumstances were such that it was a misfortune to be out of work through no fault of one's own making and resulting in helplessness.

Section II, subdivision (b) of Part II, previously referred to has been amended since, and has dropped the requirement of need as the determining factor, and substituted therefor an "investigation by the county department reveals that the income and resources are insufficient to provide the necessities of life, and assistánce shall be provided to meet a minimum subsistence compatible with decency and health." The determining factor of "need" is carried throughout the Act. See section 71-303. This amendment, if it be interpreted to include anyone who voluntarily leaves his means of livelihood, such as a striker, would be unconstitutional, but, if the section be interpreted as it has been by the Department of Public Welfare, prior to the orders concerning the strikers, and as recited in the Board's order, "to protect the women and children of affected families," so that the element of need as a result of "age, infirmity, or misfortune" is such as to arouse the "sympathy and aid of society," then the Act is constitutional.

The constitutionality of the Act, and the interpretation of the Department of Public Welfare as to payments of aid to families of striking workmen, have not been raised in this case. However, this factor is mentioned to show that indeed the Department of Public Welfare is being fair in giving anything to strikers and their families so long as they voluntarily leave their means of livelihood. This is not to be interpreted to mean that a strike cannot create a misfortune which would arouse the sympathy and aid of society. Quite the contrary, a strike could cause such a misfortune to workers who are not participants in the strike and who do not have a voluntary participation required.

The parties to this action, that is, the Union and its executive committee, must, in order to be proper parties, as alleged, represent the membership as a whole. If they do thus represent the

membership as a whole, which we will assume for the purpose of this opinion, then they are voluntarily leaving their means of livelihood to benefit themselves; and, this cannot be interpreted under the Constitutional provision to be such ''misfortune as to arouse the sympathy and aid of society.'' Quite the contrary, collective bargaining and strikes in connection therewith, are not a misfortune, but may be good fortune, if properly conducted. The object of such strikes is to benefit oneself through collective activity. It cannot be said that voluntary activity to benefit oneself is ''misfortune.''

Of course, in a given set of circumstances, an individual may not be a ''volunteer striker.'' He may not even be sympathetic with the objects and aims of a strike as an individual. This is not made to appear under the pleadings in this case, the Union itself being the party. Under the circumstances suggested heretofore, it might be necessary to ''pierce the 'Union Veil' '' to determine whether an individual case is a ''misfortune.''

In 41 Am. Jur., Poor and Poor Laws, sec. 18, p. 694, it is said: ''An able-bodied man who can, if he chooses obtain employment which will enable him to maintain himself and his family, but refuses to accept that employment, is not entitled to public relief, although relief may properly be extended to the wives and children of such men.''

And again, in 41 Am. Jur., Poor and Poor Laws, sec. 19, p. 694, it is said:

''It is not the one who is in want merely, but he who, being in want, is unable to prevent or remove such want. There is the idea of helplessness, as well as of destitution.

''Cold and harsh as the statement may seem, it is nevertheless true that the obligation of the state to help is limited to those who are unable to help themselves.''

Thus, we observe that under the Constitution, Art. X, sec. 5, and the welfare statutes, ''needs'' of an individual are left to the discretion of the Board; after it has determined that the cause of destitution is due to ''age, infirmity or misfortune'' sufficient

to have aroused the sympathy and aid of society. A voluntary cessation from available means of livelihood, a strike, is not such a misfortune.

However, this determination does not extend to the spouses and children of the workers.

Then, does the Board's order, heretofore set out, constitute, prima facie, an abuse of discretion? It has these characteristics.

(1) It is a temporary, localized situation.

(2) It makes provision to protect the wives and children, so far as funds are available.

(3) It recites a severe limitation of funds available to the State Welfare Department.

(4) It recites a need to protect welfare recipients throughout the state who would otherwise be in jeopardy of becoming completely without funds.

(5) It provides a $300 allowance per family for emergency needs.

(6) It provides for a reconsideration as the situation demands and as funds are available.

It is clear from Part 2 of the Public Welfare Act, R.C.M. 1947, secs. 71-301 through 71-314, applicable to general relief assistance, that the Board has wide discretionary powers. The Board sets up the regulations and standards of assistance.

The only real question posed as to whether the Board has abused its discretion is as to the meaning of section 71-305 is to "equal consideration" heretofore set out and partially discussed.

What does the term "equal consideration" mean as used in section 71-305. It certainly does not mean that the Board must adopt equal rules and regulations for all applicants. This is admitted by the majority opinion. On the contrary, from the exhibits in this record, it is seen that the amount of payment to each applicant depends first on needs as to several distinct categories, food, clothing, shelter, medical attention and other factors relating thereto. It also is contemplated from the exhibits and the rules and regulations of the Board contained in those

exhibits that some applicants may be only partially in need. That is, a working man having only part-time employment may be able to partially support his family but still be suffering such a misfortune as to require special help. It is also seen from the exhibits that there are several hundred separate categories set up relating to the size of families. Payments in varying amounts are established for different sized families, and consideration is even given to the age of children. There is a difference, for example, between the amount of relief payments made to pre-school, grade school, and high school children. There is also a difference as to adults in certain categories.

The public assistance to those persons eligible for assistance under other parts of this act, referred to in section 71-305, relates to aid to the blind, aid to the aged, aid to dependent and neglected children, aid to silicotics, aid to industrial disabled, and others. It is seen that the "equal consideration" is as between those employable or unemployable and the previously set out, infirm, aged, and youthful persons, or those suffering a misfortune as outlined in the Constitution.

As previously related, the reference as to whether or not one who is employable or unemployable, as being entitled to "equal consideration" with others contained in the Welfare Act must be as to whether one is out of work and employable and thus helpless, or unemployable and thus helpless. It cannot be interpreted as to mean one who is employable, but who does not desire to work, because if it was so interpreted he would not be one to suffer a misfortune as required by the Constitution, and therefore such interpretation would render the Act unconstitutional.

To summarize then, the Board does have a wide discretion and authority to set up separate standards for applicants for general relief assistance. I would question whether or not this authority is so broad as to eliminate the need of an investigation of the resources of an applicant to determine whether or not he is in need and helpless such as might be suggested in the

Board's order which provides that a $300 allowance in securities and cash might be retained by the families under consideration for emergency needs. However, in view of the other provision of the order, that is, that fifty percent of the normal family payment shall be made, and in view of the fact that it is a temporary local situation, subject to review, and in view of the fact that there is recited a severe shortage of funds; taking all of these factors together, I am not prepared to say that the Board's order is such an abuse of discretion as to render it invalid.

For the reasons previously related, including those technical reasons discussed in the first part of this opinion and also going on to the merits of the case, I find no abuse of discretion as to the Board's order and would reverse the district court, set aside the writ of mandate, and judgment previously issued, and would order the case dismissed.

MR. CHIEF JUSTICE HARRISON:

I concur in the dissenting opinion of Mr. Justice Castles.

I think the principles laid down by this court in its unanimous opinion in State ex rel. Blenkner v. Stillwater County, 102 Mont. 130, 56 Pac. (2d) 1085, are applicable here. In that case it was held that an application for a writ of mandamus must allege facts which show not only a duty on the part of the respondents, but also an ability on respondents' part to perform that duty and, further, that where it is sought to compel the payment of money, it must be made to appear that there are funds from which the payment can be made.

In the opinion in State ex rel. Dean v. Brandjord, 108 Mont. 447, 461, 92 Pac. (2d) 273, 279, which was a mandamus action to compel payment of old age assistance granted to relator but reduced by order of the Welfare Department, in discussing the discretion vested in the Welfare Department this pertinent observation is made:

"The State Board having been given so much to operate on for

that period, and no more, it then became its duty under the Act to adopt a policy which would best subserve the cause of old age assistance within the means furnished for that purpose. Whether it would be wiser for it to pay full quotas and prematurely expend most, if not all, of the entire fund appropriated for the given period, or whether the needy aged now qualified to receive payments, and the ever increasing number of prospective recipients who may qualify later, would be more equitably and effectively assisted by the general reduction inaugurated by the board, is solely a question of administrative discretion vested exclusively in the board and its administrator. If a general policy of reduction is by the board deemed necessary for the government of the state and county departments, it is its function and duty imposed by the legislature to make such reductions. It is not our province to interfere with the discretionary actions of the State Board, where it appears that it is acting within the scope of its authority. Freeman v. Board of Adjustment, 97 Mont. 342, 34 Pac. (2d) 534; State ex rel. School Dist. No. 29, Flathead County, v. Cooney, 102 Mont. 521, 59 Pac. (2d) 48; State ex rel. Bowler v. Board of Com'rs, 106 Mont. 251, 76 Pac. (2d) 648.''

Since I agree with the interpretation of section 71-305, R.C.M. 1947, set forth in Mr. Justice Castles' dissenting opinion, I do not believe that we should limit the discretion of the State Board in its attempt to protect the women and children of affected families as long as possible with the funds available, without prejudicing welfare recipients throughout the State of Montana. I believe all parties concede the situation is temporary and urgent and I do not believe that it was the intention of the Legislature to require strict formality in every particular before some provision can be made to render immediate assistance.

It is extremely unfortunate that the record in this matter comes before this court solely on a motion to quash, filed by the attorney general, because while to my mind the motion is well-taken and should have been sustained, but since the ma-

jority of this court feel otherwise, it permits the disposition of this matter without any evidence being presented on behalf of the State Department and results in a decision being made, in a matter which I deem of great importance to all people of our state, upon a one-sided presentation of what the fact situation really is.

Referring to the comments of Mr. Justice Angstman in his concurring opinion, particularly with regard to the statement that the affirmance of the district court does not necessarily increase the amount of assistance to be paid over and above what the Welfare Department allowed, Mr. Justice Castles' dissenting opinion points out very carefully that it is the families of the strikers who are being protected, and not the strikers themselves, and since I agree with him I would say that a reasonable interpretation of the order of the Welfare Department is that the family must qualify for general relief in order to have received public assistance at a rate not to exceed 50 percent of the standard budget. Thus it would appear to me that all present recipients of general relief under the Board's order would be able to show ''need'' and be qualified under the order of the district court to receive the full standard budget. If this be true the district court order doubles the welfare load being presently carried and in addition thereto will add such single men as qualify. It would seem to me then that to comply with the order of the district court will require the expenditure of more than twice as much money as to allow the matter to be handled by the Welfare Department, the body charged with the administration of public relief, and best able to determine how far it can go with the funds available to it for that purpose without prejudicing the well-being of welfare recipients throughout the state.