Chief Judge Fuld.
We are called upon to decide whether persons on strike may obtain public assistance if they are “ unable to maintain themselves ” within the sense of section 131 of the Social Services Law and otherwise comply with the provisions of that statute.
For over 20 years the Commissioner of Social Services of the State of New York, in administering section. 131, has provided such assistance.[1] Challenged in 1969 by the Commissioner of the Department for Social Services of Onondaga County (John L. Lascaris) on the ground that subdivisions 1 and 4 (of § 131) rendered striking workers ineligible for public assistance, the. State Commissioner’s administrative practice was accorded judicial approval. (Lascaris v. Wyman, 61 Misc 2d 212, 215 [herer *390 after referred to as Lascaris 7].) [2] No appeal was taken from that decision. Subsequently, in 1971, the Legislature, unquestionably aware of the State Commissioner’s long-established administrative policy, passed an amendment to subdivision 4, elaborating upon the statute’s definition of an “ employable ” person.[3] As indicated, the question posed on this appeal, here as *391 of right, is whether under subdivision 4, as amended in 1971, the State Commissioner may continue to make public assistance grants available to otherwise qualified persons on strike.
The present case — and the facts are substantially undisputed — stems from a strike, begun in the summer of 1971, by the Communication Workers of America against the New York Telephone Company and other employers. Although the national union soon reached a settlement with the employers, the locals in this State — Locals 1123, 1152, 1191 and 1197, affiliated with the Greater Syracuse Labor Council — refused to ratify it and continued to strike until February, 1972. Shortly after commencement of the strike, certain members of these local unions, including Charles Bugnacki, Bari Auslander and Thomas Gentile, applied to the Onondaga County Department for Social Services for “ public assistance.” As required by subdivision 4 of section 131, each of the three named persons “ registered ” with the nearest local employment agency of the Department of "Labor. Their applications wére denied.
As he had done in 1969, County Commissioner Lascaris brought an action in the Supreme Court against the State Commissioner in which he sought confirmation of his administrative determination denying the striking workers assistance. In his complaint, after setting forth the 1971 amendment to subdivision 4, he alleged, among other matters, that “ a striking employee renders himself ineligible for public assistance because of the nature of a strike [because] he is not available for full-time permanent employment elsewhere and, therefore, limits his availability on the employment market. ’ ’
Following the interposition of their answers — in which collateral estoppel and res judicata were pleaded in reliance on the *392 1S69 Lascaris I decision (61 Misc 2d 212, supra) —the defendants moved, pursuant to CPLR, 3211 (subd. [a], par. 5), to dismiss the complaint. The justice at Special Term, treating the motion as one for summary judgment, decided in favor of the plaintiff County Commissioner (68 Misc 2d 523). It was his view that the 1971 amendment “ eliminated strikers from entitlement to public assistance, no matter how justified their grievance.” Upon appeal, the Appellate Division unanimously reversed, granted summary judgment in favor of the defendant State Commissioner and directed the plaintiff to make available and pay public assistance benefits to striking workers who were eligible therefor (38 A D 2d 163). In the course of its opinion, written by Justice Cabdamohe, it declared that, (1) “ immediately prior to the 1971 amendment to subdivision 4 * * *, strikers were eligible to receive public assistance provided that they registered with the State employment office and did not refuse any new employment opportunities ” and (2) “ the amendment to subdivision 4 * * * does not affect their rights to receive welfare ” (38 A D 2d, at pp. 167,168).[4]
We agree with that conclusion. Subdivision 1 of section 131 of the Social Services Law expressly recites that “ [i] t shall be the duty of social services officials, insofar as funds are available for that purpose, to provide adequately for those unable to maintain themselves, in accordance with the requirements of this article and other provisions of this chapter. They shall, whenever possible, administer such care, treatment and service as may restore such persons to a condition of self-support or self-care, and shall further give such service to those liable to become destitute as may prevent the necessity of their becoming public charges.” Subdivision 4 was added in 1959 (L, 1959, ch. 715) to recite that assistance shall not be given to “an *393 employable person who has not registered with the nearest local employment agency of the department of labor or has refused to accept a position for which he is fitted and which he is able to accept.” As noted above (pp. 390-391, n. 2, n. 3), it was amended in !969 (L. 1969, ch. 184, § 4) and again in 1971 (L. 1971, ch. 102).
Under subdivision 4, as it read prior to 1971, it is manifest that a person on strike was an “ employable person ” and, by that token, ineligible for public assistance only if he failed to register with the appropriate employment agency or “ refused to accept employment in which he is able to engage. ” Assuredly, no basis existed for excluding a striking worker from the reach of the statute on the ground that he could not register with such employment agency “ because of age, health or other disability.” In our judgment — as the Appellate Division and the court in Lascaris I (61 Misc 2d 212, supra) decided — the State Commissioner was thoroughly justified in ruling that a person on strike does not, simply because he is on strike, “refuse” to accept employment. As bearing on this, it is worth noting that the only two courts outside of this State which have considered the problem have reached the same conclusion under statutes similar to our own. (See Strato-O-Seal Mfg. Co. v. Scott, 72 Ill. App. 2d 480, 485-486 [Ill. Rev. Stat., 1963, ch. 23, § 401 (now Ill. Rev. Stat., 1967, ch. 23, § 6-1.4)]; ITT Lamp Div. of Int. Tel. & Tel. Corp. v. Minter, 435 F. 2d 989, 995, cert. den. 402 U. S. 933 [Mass. Gen. Laws, ch. 117, § 1B (now § 3)]; see, also, State ex rel. International Union v. Montana State Dept. of Public Welfare, 136 Mont. 283 [Rev. Codes Mont., 1947, § 71-305].)[5]
Quite obviously, the 1971 amendment of subdivision 4 of section 131 did not affect the critical determination that strikers do not “ refuse ” employment merely by going out on strike. On the contrary, that amendatory act simply listed those who were deemed “ ««employable ” and thus beyond the reach ,of the statute altogether. In point of fact, the amendment may well be regarded as legislative approval of the construction long accorded section 131 by the State Commissioner. (See, e.g., *394 2 Sutherland, Statutes and Statutory Construction [3d ed., 1943], § 5109, pp. 525-526.)
Nor may the payment of welfare benefits to needy strikers be regarded as the equivalent of State subsidization of the strike in violation of the State’s policy of neutrality in labor-management disputes — as reflected by the Legislature’s suspension of unemployment benefits for the first seven weeks of a “ strike, lockout or other industrial controversy ” (Labor Law, § 592, subd. 1; see, e.g., Matter of Burger [Corsi], 277 App. Div. 234, 236, affd. 303 N. Y. 654; Matter of Heitzenrater [Hooker Chem. Corp.], 19 N Y 2d 1, 7). It may fairly be said that in cases such as this the policy of governmental neutrality in labor controversies is, in reality, little more than an admirable fiction. Although, on the óne hand, the State May not be acting in a-strictly neutral fashion if it allows strikers to obtain public assistance, it may not, on the other hand, be seriously maintained that the State .adopts a neutral policy if it renders strikers helpless by denying them public assistance or welfare benefits to which they would otherwise be entitled.[6] Indeed, it seems manifest that public assistance serves a purpose quite different from and, by that token, not in conflict with that which underlies the State’s policy of neutrality. As the court" observed in ITT Lamp Div. of Int. Tel. & Tel. Corp. v. Minter (435 F. 2d 989, 994-995, cert, den. 402 U. S. 933, supra) — which, as noted, upheld an administrative practice similar to the one here in question— “ welfare programs, supplying unmet subsistence needs to families without time limitation, address a more basic social need than does unemployment compensation, which attempts to cushion the shock of seasonal, cyclical, or technological unemployment by making available time limited benefits to individual workers, varying in relation to their prior earnings and without reference to demonstrated need.” In any event, in light of. this State’s long-standing administrative policy sanctioning *395 assistance payments to strikers, the Legislature, if it considers such a policy impermissible, should manifest its design in clear and unmistakable terms. Until such time as it does, we construe the statute as it stands and has been administered.
The plaintiff, however, contends that a striking worker should be stamped as ineligible for assistance, since, it being likely that he will returh to his “ struck” employer at the conclusion of the strike, he has, to quote the plaintiff, “ in effect refused to accept any other employment.” In support of this contention, he relies primarily on a 1972 “ fair hearing ” decision rendered (pursuant to Social Services Law, § 353, subd. 2) by the defendant State. Commissioner. (See Matter of Darrow, decision, dated Jan. 28, 1972; see, also, Matter of Martinez, decision of Commissioner of Social Services, dated Aug. 3,1971.) Neither decision, it should be noted, had anyhing to do with workers on strike. In Barrow (supra), the applicant for assistance had actually asserted that he would accept the job offered but that he ‘' intended to quit as soon as he heard from his former employer.” On these facts, the State Commissioner, concluding that the employment interviewer correctly found that the applicant was “ not interested in the particular job for which he was applying,” affirmed the County Commissioner’s determination that the applicant had “ refused to accept employment in which he was able to engage.” The short answer to the plaintiff’s argument is that the applicants for assistance in the present case have — and this, is conceded — registered for other employment (“ part-time, full-time, temporary or permanent employment ”), as required by subdivision 4, and there is no evidence whatever in the record that they have either failed to attend job “ interviews ” or refused “ referrals ” or that they have refused to accept an offer of such employment.[7]
The remaining contention — grounded upon the doctrine of pre-emption and urged upon us by the amicus. Chamber of Commerce — that granting public assistance to strikers constitutes
*396 “ an unconstitutional interference with the system of free collective bargaining prescribed by the Federal Government ”, lacks substance. (See, e.g., ITT Lamp Div. of Int. Tel. & Tel. Corp. v. Minter, 435 F. 2d 989, 994, cert. den. 402 U. S. 933, supra.) In the first place, it is not at all clear — there is no evidence in the record on the point — exactly what impact public assistance grants have on the system of collective bargaining. [8] In the second place, the State’s interest in providing welfare for its needy citizens is unquestionably a substantial one, and we will not assume that Congress has deprived, or intended to deprive, the State of the power to serve that interest where, as here, it chooses to provide assistance and care to workers rendered indigent by labor disputes, even if such aid has some impact on national labor policy. To so immobilize the State requires a clear expression of congressional intent. (See ITT Lamp Div. of Int. Tel. & Tel. Corp. v. Minter, 435 F. 2d 989, 994, cert, den. 402 U. S. 933, supra; Grinnell Corp. v. Hackett, 344 F. Supp. 749,754, opp. pending — F. 2d — [1st Cir. Nos. 1275-6]; see,
also, Francis v. Davidson, 340 F. Supp. 351, 363, affd. sub nom. Davidson v. Francis, 409 U. S. 904; Note, Welfare for Strikers, 39 U. Chi. L. Rev. 79, 106-109; Note, Welfare Assistance to Strikers, 67 Nw. U. L. Rev. 245, 251-254; cf. San Diego Unions v. Garmon, 359 U. S. 236, 243-244.)
The order appealed from should be affirmed, without costs.
Judges Burke, Scileppi, Bergan, Breitel, Jasen and Gibson concur.
Order affirmed.

. See, infra, p. 393, n. 5, as to administrative practice in other jurisdictions.

. Subdivision 1 of section 131 of the Social Services Law provides:
“ 1. It shall be the duty of social services officials, insofar as funds are available for that purpose, to provide adequately for those unable to maintain themselves, in accordance with the requirements of this article and other provisions of this chapter. They shall, whenever possible, administer such care, treatment and service as may restore such persons to a condition of self-support or self-care, and shall further give such service to those liable to become destitute as may prevent the necessity of their becoming public charges.”
Subdivision 4, originally enacted in 1959 (L. 1959, ch, 715), was amended in 1969 to read as follows (L. 1969, ch. 184, § 4):
“ 4. No assistance or care shall be given to an employable person who has not registered with the nearest lojbal employment agency of the department of labor ór has refused to accept employment in which he. is able to engage.
“ A person shall be deemed to have refused to accept such employment if he:
“ a. fails to obtain and file with the social services district at least semi-monthly a new certificate from the appropriate local employment office of the state department of labor stating that such employment' office has no order for an opening in part-time, full-time, temporary or permanent -employment in which the applicant is able to engage, or
“ b. willfully fails to report for an interview at an employment office with respect tó employment when requested to do so by such office, or
“ c. willfully fails to report to such office the result of a referral to employment, or
“ d. willfully fails to report for employment. Such willful failures or refusal as above listed shall be reported immediately to the social services district by such employment office.
“This shall not apply to persons who cannot register with such employment agency became of age, health or other disability (Emphasis supplied.)

. The 1971 amendment (L. 1971, ch. 102) omitted the sentence beginning,
“This shall not apply” (see n. 2, supra), and added the following detailed definition of “employable” person:
“ For the purposes of [sub'd. 4] “ * a person shall be deemed employable if such person is not rendered unable to work by*: illness or significant and substantial incapacitation, either mental or physical, to the extent and of such duration that such illness or incapacitation
*391 prevents such person from performing services; advanced age; full-time attendance at school in the ease of a minor, in accordance with provisions of this chapter; full-time, satisfactory participation in an approved program of vocational training or rehabilitation; the need of such person to provide full-time care for other members of such person’s household who are wholly incapacitated, or- who are children and for whom required care is not otherwise reasonably available notwithstanding diligent efforts by such person and the appropriate social services department to obtain others to provide such care. A person assigned to and participating in a public works project * * * shall be deemed employable but not employed,”

. Permitted to intervene as defendants at Special Term were the applicants mentioned above, individually and on behalf of all those similarly situated, as well as the local unions themselves and the Greater Syracuse Labor Council. The national union, the Communication Workers of America, has filed an amicus brief in our court, as it did below, in support of the position espoused by the defendant Commissioner. Although we granted permission to the United States Chamber of Commerce to file an amicus brief supporting the stand taken by the plaintiff County Commissioner, the court denied its application — made on papers (30 N Y 2d 675) and renewed on oral argument — to intervene.

. Moreover, it is of significance that upwards of 30 States make some sort of public assistance available to striking workers if they are in need and otherwise qualify under the applicable statutes. (See Note, Welfare for Strikers, 39 U. Chi. L. Rev. 79, 97 [n. 104], 101 [n. 132].)

. "Where, as here,” it has been said, “the employer’s business interest is pitted against a destitute striker’s need for food and shelter, the balance can only tip in favor of the striker. * * * The state can hardly be viewed as encouraging strikes by allowing those payments; the prospect of receiving a fraction of normal wages, after the exhaustion of all savings and other assets, would hardly seem an incentive to strike.” (Note, Welfare Assistance to Strikers, 67 Nw. U. L. Rev. 245, 260.)

. We have no occasion here to consider whether an applicant on strike is entitled to public assistance if, although he diligently and in good faith satisfies fhe job-interview and the referral requirements, no employer will hire him even for part-time employment because of the belief that he .may return to his old. employer upon the termination of the strike.

. There is, of course, some impact, since public assistance does provide impoverished strikers subsistence level economic support for the length of the strike and thus somewhat eases the pain of a long strike. (See, generally, Note, Welfare for Strikers, 39 U. Chi. L. Rev. 79,101-106; see, also, A. Thieblot and R, Cowin, Welfare and Strikes: The Use of Public Funds to Support Strikers [1972].)